**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JENNIFER KELLEY, | ) | CASE NO. 1:21-CV-00024-PAB |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.     INTRODUCTION

Plaintiff Jennifer Kelley ("Kelley") seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated 09/02/2022). For the reasons set forth below, the undersigned RECOMMENDS that the Court VACATE the Commissioner's decision and REMAND the matter pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

## II.     PROCEDURAL HISTORY

On May 1, 2018, Kelley filed an application for DIB, alleging a disability onset date of March 5, 2017. (ECF Doc. No. 12, Exhibit 1D, PageID # 236). The application was denied initially and upon reconsideration, and Kelley requested a hearing before an administrative law judge ("ALJ"). (ECF Doc. No. 12, Exhibit 1B, PageID # 190; *id.* at Exhibit 6B, PageID # 201-02; *id.* at Exhibit 8B, PageID # 213). On May 11, 2020, an ALJ held a hearing via telephone during which Kelley, represented by counsel, and an impartial vocational expert testified. (*Id.* at PageID # 96-

125). On May 26, 2020, the ALJ issued a written decision finding Kelley was not disabled. (*Id.* at PageID # 77-90). The ALJ's decision became final on November 30, 2020, when the Appeals Council declined further review. (*Id.* at PageID # 69).

On January 6, 2021, Kelley filed her Complaint to challenge the Commissioner's final decision. (ECF Doc. No. 1). The parties have completed briefing in this case. (ECF Doc. Nos. 15, 19, 20). Kelley asserts the following assignments of error:

(1) The ALJ found at steps 4 and 5 that Ms. Kelley's statements regarding the disabling nature of her symptoms were not consistent with the evidence. This finding lacks the support of substantial evidence because the ALJ failed to comply with the legal requirements of SSR 16-3p when he evaluated the intensity, persistence and limiting effects of her symptoms.

(2) The ALJ found at steps 4 and 5 that Ms. Kelley had the residual functional capacity for light work with frequent climbing of ladders, ropes and scaffolds and frequent stooping, kneeling, crouching and crawling. This finding lacks the support of substantial evidence because the ALJ failed to include all of Ms. Kelley's non-exertional functional limitations in the RFC and failed to explain why they were omitted.

(ECF Doc. No. 15, PageID # 511).

## III.    BACKGROUND

### A.    Personal, Educational, and Vocational Experience

Kelley was born on March 2, 1975, and she was 42 years old on the alleged onset date. (ECF Doc. No. 12, PageID # 242). Kelley is a single mother with one daughter, who was 11 years old at the time of the hearing before the ALJ. (*Id.* at PageID # 107). Kelley graduated from high school and worked at Texas Roadhouse from 2002 until 2017, starting as a food server and ending as the service manager. (*Id.* at PageID # 103-04). She subsequently worked as a food server at Red Lobster from July 2017 until March 2018. (*Id.* at PageID # 117-18).

Kelley was diagnosed with ulcerative colitis at 19 years old and has experienced periods of remission. (*Id.* at PageID # 106-07). According to Kelley, her ulcerative colitis flared up in March 2018, and it has precluded her from working ever since. (*Id.* at PageID # 106). Kelley has

2

also been diagnosed with anxiety and depression. (*See id.* at Exhibit 8F, PageID # 434).

**B.    Relevant Hearing Testimony**

*1.    Kelley's Testimony*

As previously noted, Kelley testified that she was diagnosed with ulcerative colitis at age 19, and that it flared up in 2018. (*Id.* at PageID #106). She testified that her ulcerative colitis bothered her "on and off" over the years, but that this time it is "horrible." (*Id.*). Kelley testified that she had a hysterectomy in June 2018 because her "uterus was laying on [her] colon," and she has not "bounce[d] back" since. (*Id.*). Kelley testified that it feels like she has a "working volcano in [her] stomach at all times[,]" and that she has quit smoking, which her doctors recommended she do. (*Id.* at PageID # 107, 479). Kelley also testified that she experiences "excruciating gas pains" and interrupted sleep. (*Id.* at PageID # 111).

The ALJ summarized some of Kelley's additional hearing testimony as follows:

> At the hearing, the claimant alleged that she is not able to work primarily due to her stomach issues. The claimant indicated that she does not get good sleep due to waking up due to pain. The claimant testified that it takes her 45 minutes to get moving in the morning and she is constantly fatigued. She also alleges that she has to lay down and rest during the day for approximately an hour 2-3 times a day. The claimant alleged at the hearing that she is only active 2-3 hours a day, on a good day. The claimant also testified that she is susceptible to infection due to her autoimmune disease. The claimant also alleged at the hearing that, on bad days, she has to use the restroom 6 times [a] day and becomes dehydrated.

> She testified that she stopped working at the Texas Road House in May of 2018[1] because she felt she was being sexually harassed by a general manager. She alleged an onset date of March 5, 2017, a little over one year prior to the last day that she

---

[1] The record reflects some confusion as to when Kelley stopped working at Texas Roadhouse, and when she stopped working at Red Lobster. Kelley testified that she "started working [at Texas Roadhouse] in February 2002, and [she] ended there in May of 2017" (ECF Doc. No. 12, PageID # 103, 119). Kelley's attorney later interjected and stated that Kelley "stopped working in 2018[,]" and the ALJ appears to have interpreted that to mean that Kelley stopped working at Texas Roadhouse in May of 2018. (*Id.* at PageID # 104).

Later in the hearing, however, Kelley testified that she started working at Red Lobster in July 2017, and stopped working there 8 months later, *i.e.*, in March 2018. (*Id.* at PageID # 117-18). There is no indication that Kelley worked at both places at the same time. To the contrary, Kelley's testimony indicates that she started working at Red Lobster after she quit working at Texas Roadhouse. (*Id.* at PageID # 106). Thus, her attorney's indication that Kelley stopped working in 2018 appears to refer to when Kelley stopped working altogether, and not when she stopped working at Texas Roadhouse.

worked. The medical records indicate medical issues arising in March of 2018.
(*Id.* at PageID # 86). Kelley also testified that, other than her primary care doctor who prescribed her fluoxetine, she was not seeing a medical professional for any kind of mental health treatment, but was interested in doing so. (*Id. at* PageID # 110-11).  Kelley further testified that she is "tired all time" as a result of the ulcerative colitis and the side effects from her medications. (*Id.* at PageID # 112). On a good day, Kelley testified, she is able to do laundry, clean up around the house, help her daughter with homework, and prepare meals. (*Id.* at PageID # 113). On a bad day, however, Kelley "just kind of lay[s] around all day and [doesn't] get really anything done." (*Id.*).

### 2.   *Vocational Expert's Testimony*

The ALJ asked the vocational expert ("VE") three hypothetical questions. First, the ALJ asked the VE whether an individual who "can engage in light exertion; who can frequently climb ladders, ropes, and scaffolds; frequently stoop, kneel crouch, and crawl; and no other limitations" could return to Kelley's past work as a dining room manager. (*Id.* at PageID # 120). The VE responded, "Yes." (*Id.*). Second, the ALJ asked "if [she] was to add that the person is off-task 10% of the day, exclusive of breaks, how would that impact your answer?" (*Id.*). The VE responded: "That would not impact my answer." (*Id.*). Third, the ALJ asked "if [she] was to add to Hypothetical #1 the person would . . . miss work, or come in late one day, or leave work early one day, one day per month . . . [would] that information impact your testimony in any way?" (*Id.* at PageID # 120-21). The VE responded "No, it does not." (*Id.* at PageID # 121). The VE then indicated that more than one absence/tardiness per month would generally result in a write-up or some sort of supervisory action. (*Id.*).

Kelley's attorney then asked the VE whether missing more than one day per month, or not being able to complete a full day of work more than once per month, would eliminate Kelley's past work experience and/or all jobs. (*Id.* at PageID # 121). The VE responded that it would

eliminate all jobs. (*Id*. at PageID # 122). Kelley's attorney then asked whether unscheduled restroom breaks lasting for thirty minutes, once or twice per day, would be tolerated. (*Id*. at PageID # 122-23). The VE responded that such restroom breaks would not be tolerated. (*Id.*).

### C.     Relevant Medical Evidence

The discussion of the medical evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and/or deemed relevant by the undersigned.

#### 1.     *Juan Solis, M.D.*

On January 1, 2020, Dr. Solis completed a "Crohn's & Colitis Residual Functional Capacity Questionnaire" provided to him by Kelley's attorney. (ECF Doc. No. 12, Exhibit 8F, Page ID # 434-38). In it, Dr. Solis indicated that he diagnosed Kelley with ulcerative colitis with rectal bleeding, GERD, anxiety, and depression. (*Id.* at PageID # 434). Dr. Solis identified Kelley's symptoms as malaise, bloody diarrhea, fatigue, abdominal pain and cramping, and loss of appetite. (*Id.*). Dr. Solis indicated that: (1) Kelley experiences flare ups related to eating, stress, and smoking; (2) Kelley's impairments were expected to last at least twelve months; (3) Kelley was capable of "low stress jobs[;]" (4) Kelley could continually sit for one hour and stand for 15 minutes; (5) during an 8-hour work day, Kelley could sit for about four hours and stand/walk less than two hours; (6) Kelley would need a job that permits ready access to a restroom and unscheduled restroom breaks (about 30 minutes each) one to two times per day, two to three times per week, with two to fifteen minutes of advance notice; and (7) the side effects of Kelley's prescribed medications include persistent nausea, fatigue, and diarrhea. (*Id.* at PageID # 434-38).

Dr. Solis evaluated Kelley on January 2, 2020, related to her disability application. (*Id*. at Exhibit 11F, PageID # 477-88). Dr. Solis assessed Kelley, in part, for: (1) ulcerative colitis with rectal bleeding; (2) GERD: (3) anxiety with depression; (4) tobacco use disorder; and (5)

marijuana use. (*Id.* at PageID # 478). Regarding his impressions, Dr. Solis noted that Kelley was "[s]omewhat lost to follow-up" but was being evaluated for her application for disability. (*Id.* at PageID # 479). Dr. Solis's January 1, 2020 report noted that Kelley's smoking exacerbated her condition and advised Kelley to minimize smoking. (*Id.* at PageID # 479). Dr. Solis's report also indicated that "[u]nfortunately," he and Kelley needed to choose between marijuana and benzodiazepines, and that Kelley indicated that marijuana was more helpful to her. (*Id.*). He, therefore, advised Kelley to consider obtaining medical marijuana. (*Id.*)

Dr. Solis's January 1, 2020 report also indicated that Kelley continues to have GI symptoms, including nausea, abdominal distress, and blood in her stool. (*Id.* at PageID # 480). On physical examination, Dr. Solis noted that Kelley was alert, oriented, and cheerful. (*Id.* at PageID # 482). He also noted that Kelley had positive bowel sounds. (*Id.* at PageID # 483).

Prior to 2020, other medical records from Dr. Solis (*e.g.*, records from September 20, 2019) indicated that Kelley presented as relatively cheerful and in good spirits, with normal bowel sounds, and her abdominal distress controlled. (*See id.* at Exhibit 11F, PageID # 489, 491).

### 2.    *Ronald G. Smith, Ph.D. – Psychological Report Dated March 1, 2019*

The Division of Disability Determination ("DDD") referred Kelley to Ronald G. Smith, Ph.D., a clinical psychologist, for a clinical interview. (ECF Doc. No. 12, Exhibit 3F, PageID # 374). Dr. Smith evaluated Kelley on February 26, 2019, and provided a report on March 1, 2019. (*Id.*) Dr. Smith reported, in part that: (1) Kelley was cooperative and related well; (2) Kelley's responses were direct and to the point, and her thinking was well organized; (3) Kelley showed appropriate affective expression with a good range of affect; (4) Kelley denied being depressed but admitted she was not happy; (5) Kelley "get things done that she needs to do around the house most days[;]" (6) Kelley reported experiencing anxiety and "freak[s]" when anything goes out of her routine, which contributes to her stomach problems; (7) Kelley reported sleeping a lot during

the daytime; and (8) Kelley was alert and in good contact with reality. (*Id.* at PageID # 376-77).

Regarding Kelley's activities of daily living, Dr. Smith's 03/01/2019 reported stated:

These days she's up at 7 in the morning. She sits and holds her dogs and she does some laundry during the day. She might run to the store for a short trip and make her daughter's lunch. She cleans her house. When asked if she goes anywhere she said she might go to her mom's house which is 20 minutes away. She does not eat in restaurants because of her colitis and also she feels because of the harassment she's experienced in a restaurant environment.

(*Id.* at PageID # 378).

Regarding Kelley's sleep, Dr. Smith's 03/01/2019 report stated, in part: "She gets seven or eight hours of sleep and takes half hour naps in the afternoon a couple of times a day." (*Id.*). For suggested DSM-V diagnosis, Dr. Smith reported: (1) persistent depressive disorder (dysthymia) with pure dysthymic syndrome; and (2) adjustment disorder with anxiety. (*Id.*). In his functional assessment, Dr. Smith stated: (1) Kelley "would appear to be capable of understanding and remembering job instructions. Her ability to carry them out successfully will be hampered by her worry and anxiety[;]" (2) "[m]entally [Kelley] may have trouble maintaining adequate attention and concentration and maintaining persistence in the performance of simple or more complex tasks due primarily to anxiety[;]" (3) "[o]n a mental basis she would be able to respond appropriately to supervision and coworkers in a job setting[;]" and (4) [m]entally she may have some difficulty dealing appropriately with work pressures in a job situation due to her tendency to worry excessively and her feelings of anxiety." (*Id.* at PageID # 378-79).

### 3. *Lisa Foulk, Psy.D. & Maureen Gallagher, D.O.*

The record indicates that Lisa Foulk, Psy.D. evaluated Kelley's mental condition based upon the record without examining Kelley on behalf of the DDD on March 5, 2019. (*See* ECF Doc. No. 12, Exhibit 1A, PageID # 126-38). Dr. Foulk determined that Kelley had: (1) no limitations in her ability to understand, remember, or apply information; (2) mild limitations in her ability to interact with others; (3) moderate limitations in her ability to concentrate, persist, or

maintain pace; and (4) moderate limitations in her ability to adapt or manage herself. (*Id.* at PageID # 132).

On March 4, 2019, Dr. Gallagher determined that, with respect to Kelley's physical residual functional capacity, Kelley could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk about six hours during an eight-hour workday; and (4) could sit for about six hours during an eight-hour workday. (*Id*. at PageID # 135-36). These assessments were affirmed upon reconsideration. (*Id*. at Exhibit 5A, PageID # 158-172).

### 4.      *North Shore Gastroenterology*

Kelley received treatment from North Shore Gastroenterology beginning in April 2018. (*See* ECF Doc. No. 12, Exhibit 1F, PageID # 321). Medical records from 2018 from North Shore Gastroenterology indicate that: (1) Kelley's ulcerative colitis flared up in March 2018 (*id*. at PageID # 321); (2) Kelley continued to smoke (*id.*); (3) Kelley had positive bowel sounds in all four quadrants (*id*. at PageID # 322); (4) Kelley was alert, oriented, and cooperative (*id.*); (5) Kelley was experiencing abdominal pain and bloody diarrhea (*id*. at PageID # 323); (6) Kelley had her first colonoscopy in 2018 (*id.*); (7) Kelley's colon biopsies "reveal fragments of benign colonic mucosa with features of lymphocytic colitis including and increased intraepithelial lymphocytosis and accompanying plasma cell lamina propria infiltrate" and "[t]hough diagnostic features of ulcerative colitis are not identified, a relationship between microscopic colitis (lymphocytic and collagenous) and primary inflammation bowel disease is well documented . . . ." (*id*. at PageID # 328); (8) Kelley's colonoscopy revealed inflammation (*id.* at PageID # 330); (9) Kelley's stool texted positive for C. diff (*id.*); (10) as of June 2018, Kelley was doing "[o]verall[] much better than before" with one solid bowel movement per day, but then after developing diffuse abdominal pain resumed having diarrhea (*id.*); (11) Kelley had an upper GI

endoscopy in December 2018, which revealed no endoscopic abnormality but mild inflammation (*id.* at PageID # 333); and (12) Kelley had a flexible sigmoidoscopy in December 2018, which revealed inflammation and internal hemorrhoids (*id.* at PageID # 336).

Medical records from 2019 indicate that Kelley experienced some symptomatic remission of her ulcerative colitis while on medication. (*See* ECF Doc. No. 12, Exhibit 6F, PageID # 427; *id.* at Exhibit 10F, PageID # 474).

## IV.    THE ALJ'S DECISION

The ALJ determined that Kelley: (1) met the insured status requirements of the Social Security Act through December 31, 2023 (ECF Doc. No. 12, PageID # 82); (2) has not engaged in substantial gainful activity since the alleged onset date (*i.e.*, March 5, 2017) (*id.*); (3) has the following severe impairments: "ulcerative colitis and irritable bowel syndrome (20 CFR 404.1520(c) and 416.920(c)) (*id.* at PageID # 83)"; (4) does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments (*id.* at PageID # 85); and (5) has the residual functional capacity ("RFC") to perform light work (*id.*).

Regarding Kelley's ulcerative colitis and irritable bowel syndrome, the ALJ explained, in part:

> **3. The claimant has the following severe impairments: ulcerative colitis and irritable bowel syndrome (20 CFR 404.1520(c) and 416.920(c)).**
>
> The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28 (Exhibits 1F-11F). There are no other medically determinable impairments that are severe . . . . The claimant also had an episode of clostridium difficile infection in April of 2018 (Exhibit 10F at 3). However, she received treatment and her condition soon improved . . . . There was also some mention of another infection in November 2018; however, there is no objective evidence that this impairment resulted in more than minimal limitations in the claimant's ability to perform basic work-related functions. The undersigned considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.

. . .

The claimant presented to her PCP and asked him to evaluate her for disability, despite his notation that she was "somewhat lost to follow-up." (Ex. 11F/ 3) He was going to evaluate her to give her benzodiazepines, but she said she preferred using cannabis. He documented advising the claimant that continued use of cannabis can worsen her GI symptoms by increasing spasms. Dr. Harris, the GI specialist, gave her the same medical advice that cannabis can exacerbate her GI symptoms. (Ex. 10F/10) But, she still maintained that she preferred the cannabis which she said she both smoked and ingested. On physical examination, in January 2020, her physician documented an essentially normal exam: normal gait, no clubbing or cyanosis; cranial nerves were normal; intact no focal deficits; no tremors, mood and affect were normal, she was cheerful and appropriate . . . .

(ECF Doc. No. 12, PageID # 83).

Regarding Kelley's anxiety and depression, the ALJ determined that those impairments caused no more than minimal limitations and were not severe. (*Id.*). The ALJ explained, in part:

The claimant's medically determinable mental impairments of depression and anxiety, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere. In making this finding, the undersigned has considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

. . .

Ronald Smith, Ph.D., examined the claimant at the request of the Division of Disability Determination (DDD) on February 26, 2019 (Exhibit 3F at 2). Dr. Smith concluded that the claimant would be capable of understanding and remembering job instructions, but her ability to carry them out successfully will be hampered by her worry and anxiety. She may have trouble maintaining adequate attention and concentration and maintaining persistence in the performance of simple or more complex tasks, but would be able to respond appropriately to supervision and coworkers in a job setting. Finally, Dr. Smith concluded that the claimant may have some difficulty dealing appropriately with work pressures in a job situation due to her tendency to worry excessively and her feelings of anxiety.

. . .

Lisa Foulk, Psy.D., evaluated the claimant's mental condition based on the evidence of record without examining the claimant on behalf of the DDD on March 5, 2019 (Exhibit 1A). Dr. Foulk concluded that the claimant had no limitations in her ability to understand, remember, or apply information, mild limitations in her ability to

10

interact with others, moderate limitations in her ability to concentrate, persist, or maintain pace, and moderate limitations in her ability to adapt or manage herself. This assessment was affirmed upon reconsideration (Exhibit 5A).

(ECF Doc. No. 12, PageID # 83-84).

The ALJ did not find the opinions of Dr. Smith or Dr. Foulk – whose opinion was primarily based upon the conclusions of Dr. Smith – to be fully persuasive. (*Id.* at PageID # 84). The ALJ explained:

> The undersigned does not find the opinions of Dr. Smith fully persuasive [as] they are vague and imprecise and he did not provide quantified limitations. For example, he used the word "may" in his opinion to address ability to understand remember and apply information/ instructions; concentration persistent and pace and dealing with work pressures. In addition, this was a onetime interview, and it appears that Dr. Smith relied primarily on the claimant's subjective reports of symptoms and limitations. His objective findings do not support more than mild limitations in functioning. For example, Dr. Smith noted that the claimant was neat and clean in appearance and cooperative. Her responses were direct and to the point and thinking was well organized. Affect was appropriate with good range. The claimant reported that she is sad and afraid, but not depressed. Insight and judgment appeared good and cognitive functioning was intact.
>
> . . .
>
> The undersigned does not find the opinions of the evaluating sources full[y] persuasive as they are primarily based on the conclusions of Dr. Smith, which are also not fully persuasive, and they are not consistent with the weight of the objective evidence of record. For example, the claimant does not receive mental health treatment other than medication from her primary care physician (Exhibit 2F at 13). The claimant is not being treated for mental health symptoms by a mental health specialist. She has not had any hospitalizations or ER visits for mental health during the period at issue. The claimant was described as cheerful with an appropriate affect. She also reported that her symptoms are controlled with medication (Exhibit 2F at 26). The claimant was described as minimally anxious (Exhibits 5F and 8F at 12). The claimant's primary care physician indicated that stress exacerbates the claimant's gastrointestinal symptoms –not her mental health symptoms (Exhibit 8F at 4). Treatment records indicate that the claimant reported no difficulty with her memory (Exhibit 2F at 26). She was also generally and consistently described as cooperative (Exhibits 1F, 2F at 13 and 28, 8F at 12, and 11F at 15). She had good grooming and hygiene (Exhibits 2F at 13 and 28, 5F at 10, 8F at 12, and 11F at 15). She was also able to care for her activities of daily living, including caring for her young daughter (Exhibit 2F at 26). The undersigned also notes that the claimant's work history as a service manager and server demonstrates a greater capacity with no intervening change in mental health symptoms.

(*Id.*).

The ALJ then concluded that, "[b]ecause the claimant's medically determinable mental impairments cause no more than 'mild' limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1))." (*Id.* at PageID # 84-85).

Regarding the severity of Kelley's impairments, the ALJ explained:

**4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

The severity of the claimant's physical impairments does not meet or medically equal the level of severity described in section 1.04 (Disorders of the spine), section 5.06 (Inflammatory bowel disease), or any other section of 20 CFR Part 404, Subpart P, Appendix 1. The claimant does not have the neurological deficits, nerve root compression, spinal arachnoiditis or lumbar spinal stenosis described in Section 1.04 of the Listing of Impairments. With regard to section 5.06, there is no evidence of obstruction, anemia, serum albumin of 3.0 g/dl or less, perineal disease, involuntary weight loss of at least 10%, or need for supplemental daily enteral nutrition.

(*Id.* at PageID # 85).

Lastly, regarding Kelley's residual functional capacity "(RFC)", the ALJ determined that Kelley has the RFC "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations: frequently climb ladders, ropes, and scaffolds and frequently stoop, kneel, crouch, and crawl." (*Id.*).

## V.    LAW & ANALYSIS

### A.    Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott*

*v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original).

**B.     Standard for Disability**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is entitled to DIB: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

**C.     Analysis**

Kelley raises two issues for judicial review. First, Kelley argues that the ALJ failed to comply with Social Security Ruling ("SSR") 16-3p when evaluating the disabling nature of Kelley's symptoms, and failed to provide an adequate analysis or explanation of her decision. (*See* ECF Doc. No. 15, PageID # 523). Second, Kelley argues that the ALJ's RFC was not supported by substantial evidence because the ALJ failed to include all of Kelley's non-exertional functional limitations, and failed to explain why they were omitted. (*Id.* at PageID # 529). Because the first issue is dispositive, the undersigned will not address the second issue.

    *1.  **SSR 16-3p: Intensity, Persistence and Limiting Effects of Kelley's Symptoms***

Kelley argues that the ALJ failed to comply with the legal requirements of 20 C.F.R. § 416.929 and SSR 16-3p when the ALJ evaluated the intensity, persistence, and limiting effects of Kelley's symptoms on her ability to do basic work activities. (ECF Doc No. 15, PageID # 523). Kelley maintains that, although the ALJ found that her ulcerative colitis and irritable bowel syndrome did not meet the criteria of the appropriate Listing at Step Three, the ALJ failed to consider all of the related symptoms at Steps Four and Five. (*Id.* at PageID # 524). For the reasons that follow, the undersigned concludes that the ALJ's decision should be vacated, and the matter remanded for further proceedings.

i.      *Evaluation of Symptoms: 20 C.F.R. § 416.929 & SSR 16-3*

When a claimant alleges symptoms of disabling severity, the ALJ follows a two-step process for evaluating these symptoms. *See e.g.*, *Massey v. Comm'r of Soc. Sec.*, 409 F. Appx. 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)). If such an impairment exists, then the ALJ must next "evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 416.929(c)(1).

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. § 416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, an ALJ considers the following seven factors:

> (1) the individual's daily activities;
> (2) the location, duration, frequency, and intensity of the individual's pain;
> (3) factors that precipitate and aggravate the symptoms;
> (4) the type, dosage, effectiveness, and side effects of any medication the

individual takes or has taken to alleviate pain or other symptoms;
(5) treatment, other than medication, the individual receives or has received
for relief of pain or other symptoms;
(6) any measures other than treatment the individual uses or has used to
relieve pain or other symptoms; and
(7) any other factors concerning the individual's functional limitations and
restrictions due to pain or other symptoms.

*See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d

724, 732-33 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or

her credibility findings in terms of the factors set forth in the regulations, thereby permitting the

court to "trace the path of the ALJ's reasoning."). While an ALJ "need not analyze all seven

factors[,]" the ALJ should show that he or she considered the relevant evidence. *Hatcher v.*

*Berryhill*, Case No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (internal

citations omitted).

If claims regarding the intensity, persistence, and limiting effects of an individual's

symptoms are not substantiated by the medical record, the ALJ must make a credibility

determination of the individual's statements based on the entire case record. Credibility

determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y*

*of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective

complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable

deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*,

818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons

for the weight given to the individual's symptoms . . . and be clearly articulated so the individual

and any subsequent reviewer can assess how the adjudicator evaluated the individual's

symptoms." SSR 16-3p, 2016 WL 1119029, at * 9; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036

(6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, [the ALJ] must clearly

state his [or her] reason for doing so."); *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *13 (N.D. Ohio May 14, 2020) (providing that an ALJ is not required to provide an exhaustive account at each stage of the analysis, but must "explain her conclusions with sufficient detail to permit meaningful review[.]").

> ### ii.      Listings 5.00E & 5.06

According to Listing 5.00E, the signs and symptoms of irritable bowel disease ("IBD"), which includes ulcerative colitis, are as follows:

> diarrhea, fecal incontinence, rectal bleeding, abdominal pain, fatigue, fever, nausea, vomiting, arthralgia, abdominal tenderness, palpable abdominal mass (usually inflamed loops of bowel) and perineal disease. . . .

20 C.F.R. § Pt. 404, Subpt. P, App. 1. "Remissions and exacerbations of variable duration are the hallmark of IBD." *Id.*

According to Listing 5.06, IBD is "documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings with:

> A. Obstruction of stenotic areas (not adhesions) in the small intestine or colon with proximal dilatation, confirmed by appropriate medically acceptable imaging or in surgery, requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions at least 60 days apart within a consecutive 6–month period;
>
> OR
>
> B. Two of the following despite continuing treatment as prescribed and occurring within the same consecutive 6–month period:
>
> > 1. Anemia with hemoglobin of less than 10.0 g/dL, present on at least two evaluations at least 60 days apart; or
> >
> > 2. Serum albumin of 3.0 g/dL or less, present on at least two evaluations at least 60 days apart; or
> >
> > 3. Clinically documented tender abdominal mass palpable on physical examination with abdominal pain or cramping that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or

4. Perineal disease with a draining abscess or fistula, with pain that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or

5. Involuntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI, present on at least two evaluations at least 60 days apart; or

6. Need for supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition via a central venous catheter.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

### iii. Kelley's Arguments

Kelley argues that "SSR 16-3p required the ALJ to consider such other factors that imposed restrictions on the ability to sustain work activity and this the ALJ failed to do. Not only must the decision be based on the record as a whole, the ALJ must include a discussion of 'findings and conclusions, and the reasons or basis thereof, on all the material issues of fact, law, or discretion presented on the record.'" (ECF Doc. No. 15, PageID # 528-29 (quoting 5 U.S.C. § 557(c)(3)(A)). Kelley argues that the ALJ failed to do so.

Kelley relies on evidence indicating that: (1) her colonoscopy showed erythematous, friable with contact bleeding and ulcerated mucosa in the entire colon; (2) the endoscopy demonstrated mild inflammation in the gastric antrum; (3) the flexible sigmoidoscopy showed inflammation in the rectum; (4) she had clostridium difficile of the colon, which caused abdominal pain and cramping; (5) she experienced the symptoms set forth in Listing 500E, albeit intermittently since 2018; and (6) she experienced diarrhea and fecal incontinence with occasional related bleeding, epigastria burning, anorexia and nausea, pain and tenderness, arthralgia, and fatigue. (*Id.* at 525). Kelley asserts that, because of these symptoms – which are worsened by her anxiety and stress – she has a frequent and urgent need of a nearby restroom. (*Id.*).

Kelley asserts that, while the ALJ did mention some of her symptoms when reciting the medical records, the ALJ "failed to provide an analysis or explanation how they were considered

when evaluating the limiting effects of those symptoms." (*Id.* at PageID # 526). Kelley also asserts that the ALJ erroneously: (1) relied upon the fact that Kelley did not have a colonoscopy until 2018 (despite suffering from ulcerative colitis and IBD since she was 19) to support the ALJ's conclusion that Kelley's statements regarding her pain were not consistent with the medical records; (2) failed to acknowledge that a fluctuation in symptoms is a hallmark of IBD; (3) relied upon irrelevant medical records indicating that Kelley had a "normal gait[;]" (4) considered Kelley's cigarette and marijuana use to Kelley's detriment, despite the fact that Kelley had quit using both substances, and Kelley's doctor indicated that – if Kelley found marijuana more helpful for her symptoms than benzodiazepine – Kelley should look into getting medical marijuana." (*Id.* at PageID # 526).

Kelley also asserts that, even if her symptoms were not fully supported by the objective evidence in the record, her own statements about the intensity, persistence, and limiting effects of her symptoms should not be disregarded. (*Id.* at PageID # 526-27). She further asserts that: (1) the ALJ's determination that Kelley could perform activities of daily living on a sustained basis lacked substantial support; (2) the ALJ failed to consider the side effects of Kelley's medications when evaluating the limiting effects of Kelley's symptoms; and (3) the ALJ failed to consider and evaluate the limiting effects of Kelley's need to be close to a restroom on Kelley's ability to do sustained work activity. (*Id.* at 527-28).

### iv.    *Analysis*

Initially, the undersigned notes that Kelley has not argued that she meets the requirements of Listing 5.06 for IBD, i.e., Step Three of the sequential evaluation process. Instead, she argues that the medical records demonstrate the extent of her gastrointestinal diseases, and that she experiences the symptoms set forth in Listing 5.00E. Kelley's primary argument is that the ALJ erroneously analyzed her statements regarding the intensity, persistence, and limiting effects of

her symptoms in relation to Steps Four and Five of the sequential evaluation process. (ECF Doc.

No. 15, PageID # 524-25). Regarding the intensity, persistence, and limiting effects of Kelley's

symptoms, the ALJ explained:

> [T]he claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the objective evidence of record and other evidence, as defined in 20 CFR 404.1529(c)(4) and 416.929(c)(4). For example, the claimant has a history of being diagnosed with ulcerative colitis at age 19. Yet, she reported never having a colonoscopy until symptoms increased in March 2018. The claimant was evaluated by a gastroenterologist in April 2018 after experiencing right lower quadrant pain and fever for approximately four weeks. On examination, there were positive bowel sounds in all quadrants and abdomen was soft, nontender, and nondistended without guarding, rigidity, or rebound tenderness. There were also no abdominal masses palpable and no palpable hepatosplenomegaly. The claimant also walked with a normal gait and no focal deficits were appreciated.
>
> On April 10, 2018, she had her first colonoscopy. The physician at North Shore Endoscopy Center documented the claimant "currently not on any treatment for her UC. For the past 6 days has been having bloody diarrhea." On examination, the perianal and digital rectal examinations were normal, no fistulas or skin tags. The colonoscopy revealed a diffuse area of moderately erythematous, friable and ulcerated mucosa along the colon. The terminal ileum appeared normal, and there were no additional abnormalities on retroflexion. She was started on medications and advised to follow up with Dr. Harris in two weeks. (See Exhibit 1F/ 4). Stool collected during the procedure was also positive for clostridium difficile infection. The claimant was started on medication and by June 2018, the claimant reported improvement with just one episode of bleeding, which resolved and occasional bloating. On follow-up in October 2018, the claimant reported a 4-week history of symptom exacerbation including occasional abdominal pain and diarrhea (Exhibit 1F at 11). There was some diffuse abdominal tenderness; however, the remainder of her examination was unchanged.
>
> The claimant underwent an upper GI endoscopy in December 2018, which demonstrated mild chronic inflammation in the distal esophagus, but with a normal gastric biopsy (Exhibit 1F at 14). There was also a normal biopsy with flexible sigmoidoscopy (Exhibit 1F at 17).
>
> Treatment records from May 2019 document she was in "symptomatic remission" with Lialda medication. She had normal bowel movements without any bleeding. Mucus or abdominal pain. (Exhibit 6F at 2 and 10F/ 3). However, she was experiencing heartburn with nausea. Physical examination documents she was well nourished, no acute distress, alert, cooperative; normal heart; positive bowel sounds in all 4 quadrants, no rigidity, non distended, positive tenderness in the epigastrium, no abdominal masses; walked with a normal gait, no jaundice and no focal neuro deficits. She denied dizziness, memory loss, paralysis, depression and anxiety. (Ex.

10F/ 4)

Although the claimant reported she did not immediately receive significant improvement in her symptoms, by her follow up visit in September 2019, her abdominal distress was controlled, and she denied diarrhea (Exhibits 5F at 8 and 11F at 13). Her abdominal findings were benign on examination (Exhibit 11F at 15). However, the claimant was still reporting little improvement in her stomach pain (Exhibit 10F at 8).

(ECF Doc. No. 12, PageID # 86-87).

The ALJ then discussed some of the medical opinions, explaining:

The undersigned has considered the medical opinions of record in rendering this decision. Juan Solis, M.D., completed a medical source statement in January 2020 (Exhibit 8F at 6). Dr. Solis concluded that the claimant was capable of low stress jobs with 4 hours of sitting and less than two hours of standing/walking in an eight-hour workday. He also concluded that the claimant needs a job that allows for shifting positions at will, ready access to a bathroom, and unscheduled breaks 1-2 times a day. The claimant would also need to lay down and rest at unpredictable intervals 3 times a week for 20 minutes. Dr. Solis also concluded that the claimant can occasionally lift less than ten pounds, stoop 15 % of the time, crouch 10% of the time, and the claimant would be absent approximately three times a month.

The undersigned does not find the opinions of Dr. Solis fully persuasive as they are not well supported and are not consistent with his own examination findings and other evidence in the record. For example, he notes that these limitations are the result of anxiety, anorexia, nausea, weakness, fatigue, dehydration, and abdominal tenderness and pain. On examination at that time, Dr. Solis noted some abdominal pain (Exhibit 8F at 12). However, her gait was normal in his exams and those of Dr. Berkowitz, there were no focal neurological deficits, the claimant was cheerful and in no distress, and mood and affect were normal. This was similar to previous examinations (Exhibits 2F, 5F, 9F and 11F).

Maureen Gallagher, D.O., M.P.H., evaluated the claimant's physical condition based on the evidence of record without examining the claimant on behalf of the DDD on March 4, 2019 (Exhibit 1A). Dr. Gallagher concluded that the claimant is capable of light exertion work with frequent climbing of ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling. This assessment was affirmed upon reconsideration (Exhibit 5A). The undersigned finds the opinions of the evaluating sources persuasive, as they are well supported and consistent with the objective evidence of record. For example, they noted improvement in the claimant's condition, but with some continued occasional bloating. They noted that treatment records document diffuse abdominal tenderness, but that the remainder of her physical examinations were within normal limits. The claimant's endoscopy noted gastritis and inflammation, but biopsy was negative.

(ECF Doc. No. 12, PageID # 87-88).

Having reviewed the ALJ's decision, the undersigned concludes that the district court should not uphold the ALJ's decision because – even if there is enough evidence in the record to support the ALJ's decision – the ALJ did not "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877 (N.D. Ohio 2011) (quoting *Sarchet*, 78 F.3d at 307 (7th Cir. 1996)). For example, as Kelley points out, the ALJ cited the fact that Kelley did not have a colonoscopy until 2018 to support the ALJ's conclusion that Kelley's statements concerning the intensity, persistence, and liming effects of her symptoms were not entirely consistent with record. (ECF Doc. No. 12, PageID # 86). The ALJ, however, did not explain how this fact undermined Kelley's statements concerning the intensity, persistence, and liming effects of her symptoms, especially considering that "[r]emissions and exacerbations of variable duration are the hallmark of IBD[,]" and Kelley testified that her symptoms had been manageable up until 2018, but are now "horrible[.]" 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (ECF Doc. No. 12, PageID # 107). The ALJ also did not explain how the medical records indicating that Kelley's abdominal distress was under control at times was inconsistent with Kelley's diagnoses or her testimony.

Additionally, the ALJ noted in her decision that the alleged onset date is March 5, 2017, and that Kelley continued to work until March 2018. (ECF Doc. No. 12, PageID # 86). The medical records and Kelley's own testimony indicate that Kelley's symptoms worsened in 2018. (*See* ECF Doc. No. 12, PageID # 106). At the hearing before the ALJ, the ALJ asked Kelley about the apparent discrepancy between the alleged onset date (*i.e.*, March 5, 2017) and when Kelley stopped working due to her ulcerative colitis (*i.e.*, March 2018). (*Id.* at PageID # 118-19). Kelley expressed some surprise/confusion as to why her alleged onset date was listed as March 5, 2017, and indicated that the onset date should be March 2018. (*Id.*). The ALJ then stated that this could have been a clerical error, or someone at the Social Security office may have advised Kelley to make the onset set "one year before." (*Id.* at PageID # 119-20). Regardless, there was no dispute

22

at the hearing that Kelley was alleging disability as of March 2018. (*Id.*).

In the ALJ's subsequent decision, however, it is unclear whether the ALJ considered this discrepancy to Kelley's detriment. To that end, the ALJ's decision notes the March 5, 2017, onset date and Kelley's last day of work in March 2018, but does not reference the hearing testimony that reconciles the discrepancy between these dates. (*See id.* at PageID # 86). In other words, it is unclear whether – despite the clarifying testimony at the hearing – the ALJ determined that the discrepancy between the alleged onset date and Kelley's last day of work undermined Kelley's statements concerning the intensity, persistence, and liming effects of her symptoms.

Moreover, the ALJ's purpose for repeatedly relying upon Kelley's "normal gait" is also unclear. (ECF Doc. No. 12, PageID # 87). While the ALJ did note that Kelley presented with musculoskeletal complaints at times (*see* ECF Doc. No. 12, PageID # 85), references to Kelley's "normal gait" also appear in the ALJ's discussion of Kelley's gastrointestinal issues (*see id.* at PageID #87).

Additionally, regarding Dr. Solis, the ALJ stated, in part:

> Dr. Solis concluded that the claimant was capable of low stress jobs with 4 hours of sitting and less than two hours of standing/walking in an eight-hour workday. He also concluded that the claimant needs a job that allows for shifting positions at will, ready access to a bathroom, and unscheduled breaks 1-2 times a day. The claimant would also need to lay down and rest at unpredictable intervals 3 times a week for 20 minutes. Dr. Solis also concluded that the claimant can occasionally lift less than ten pounds, stoop 15 % of the time, crouch 10% of the time, and the claimant would be absent approximately three times a month.

(*Id.* at PageID # 87-88). The ALJ then found that Dr. Solis's opinions were inconsistent with his own examination findings and other evidence in the record, stating:

> For example, [Dr. Solis] notes that these limitations are the result of anxiety, anorexia, nausea, weakness, fatigue, dehydration, and abdominal tenderness and pain. On examination at that time, Dr. Solis noted some abdominal pain (Exhibit 8F at 12). However, her gait was normal in his exams and those of Dr. Berkowitz, there were no focal neurological deficits, the claimant was cheerful and in no distress, and mood and affect were normal. This was similar to previous examinations (Exhibits 2F, 5F, 9F and 11F).

(*Id.* at PageID # 88). It is unclear how Kelley's normal gait and/or lack of focal neurological deficits undermines Dr. Solis's conclusion that Kelley's limitations were the result of "anorexia, nausea, weakness, fatigue, dehydration, and abdominal tenderness and pain." (*Id.*).

Simply put, while the record may support the ALJ's ultimate conclusions, the ALJ's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877 (quoting *Sarchet*, 78 F.3d at 307). As a result, the undersigned recommends that the Court remand the matter for the ALJ to explain her reasoning in sufficient detail to allow the Court to conduct a meaningful review. *See* 42 U.SC. § 405, Sentence Four  ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").

### 2.  *Whether the ALJ's Decision is Supported by Substantial Evidence*

Next, Kelley argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to include all of Kelley's non-exertional functional limitations in the RFC, and failed to explain why they were omitted. As this matter should be remanded relative to Kelley's first assignment of error, in the interest of judicial economy, the Court should decline to reach Kelley's additional assignment of error. *See Kessler v. Comm'r of the Soc. Sec. Admin.*, No. 1:22-CV-00459-JDG, 2022 WL 4907704, at *11 (N.D. Ohio Oct. 4, 2022).

## VI.    RECOMMENDATION

Based on the foregoing, the undersigned RECOMMENDS that the Court VACATE the ALJ's decision and REMAND the matter pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

Dated: <u>10/24/2022</u>                                    */s Jennifer Dowdell Armstrong*

Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial

25

resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).