## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Jennifer Kelley,** | **Case No. 1:21CV00024** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| | **Magistrate Judge Jennifer D. Armstrong** |
| **Kilolo Kijakazi,** **Acting Commissioner of Social** **Security,** | **MEMORANDUM OPINION AND** **ORDER** |
| **Defendant.** | |

This matter is before the Court on the Objections of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security[1] ("Defendant" or "Commissioner") to the Report and Recommendation of Magistrate Judge Jennifer D. Armstrong regarding Plaintiff Jennifer Kelley's request for judicial review of the Commissioner's denial of her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.  (Doc. No. 23.)  In her Report & Recommendation, the Magistrate Judge recommends that this Court vacate the Commissioner's decision and remand this matter pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings.  For the reasons that follow, Defendant's Objections are WELL TAKEN, the Report & Recommendation ("R&R") is REJECTED, and the Commissioner's decision is AFFIRMED.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

I.      **Procedural History**

In April 2018, Plaintiff Jennifer Kelley ("Plaintiff" or "Kelley") filed applications for POD, DIB, and SSI, claiming she was disabled due to "blind or low vision," ulcerative colitis, and depression/anxiety.[2]  (Transcript ("Tr.") 12, 58-59, 73-74.)  The applications were denied initially and upon reconsideration, and Kelley requested a hearing before an administrative law judge ("ALJ"). (Tr. at 12, 58-87, 90-119, 145.)

On May 11, 2020, an ALJ held a telephonic hearing, during which Kelley, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 28-57.)  On May 26, 2020, the ALJ issued a written decision finding Kelley was not disabled.  (Tr. 12-26.)  The ALJ's decision became final on November 30, 2020, when the Appeals Council declined further review.  (Tr. 1-6.)

On January 6, 2021, Kelley filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  In her Brief on the Merits, Kelley asserts the following two assignments of error:

1.      The ALJ found at steps 4 and 5 that Ms. Kelley's statements regarding the disabling nature of her symptoms were not consistent with the evidence. This finding lacks the support of substantial evidence because the ALJ failed to comply with the legal requirements of SSR 16-3p when [s]he evaluated the intensity, persistence and limiting effects of her symptoms.

II.     The ALJ found at steps 4 and 5 that Ms. Kelley had the residual functional capacity for light work with frequent climbing of ladders, ropes and scaffolds and frequent stooping, kneeling, crouching and crawling. This finding lacks the support of substantial evidence because the ALJ failed to include all of Ms. Kelley's non-exertional functional limitations in the RFC and failed to explain why they were omitted.

---

[2] There is some confusion regarding Kelley's alleged date of onset.  In her applications, Kelley alleged an onset date of March 5, 2017.  (Tr. 58-59, 168, 174.)  Subsequently, however, Kelley (and her counsel) clarified that her onset date was March 5, 2018.  (Tr. 51-52.)

2

(Doc. No. 15.) The Commissioner filed her Brief on the Merits on October 21, 2021, and Kelley filed a Reply Brief on November 4, 2021. (Doc. Nos. 19, 20.)

On October 24, 2022, the Magistrate Judge issued a Report & Recommendation, in which she agreed with Kelley's First Assignment of Error and recommended that the Court vacate the ALJ's decision and remand for further proceedings. (Doc. No. 23.) The Magistrate Judge did not address Kelley's Second Assignment of Error. (*Id.*) The Commissioner filed Objections to the Report & Recommendation on November 7, 2022. (Doc. No. 24.) Plaintiff filed a Response on November 21, 2022. (Doc. No. 25.)

## II. Evidence

### A. Personal and Vocational Evidence

Kelley was born in March 1975[3] and was 45 years-old at the time of her administrative hearing (Tr. 21, 168), making her a "younger" person under Social Security regulations.[4] 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education, completed one year of college, and is able to communicate in English. (Tr. 21, 203, 205.) She has past relevant work as a dining room manager. (Tr. 20, 205.)

### B. Relevant Medical Evidence[5]

_____

[3] The Court notes that the Magistrate Judge included Kelley's full date of birth in the R&R. Out of an abundance of caution, the Court has restricted access to the R&R to parties only, to protect this sensitive information.

[4] The regulations provide as follows: "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45–49 are more limited in their ability to adjust to other work than persons who have not attained age 45." 20 C.F.R. § 404.1563(c).

[5] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On May 17, 2017, Kelley presented to primary care physician Juan Solis, M.D.  (Tr. 298-303.)  Dr. Solis noted that Kelley was "somewhat lost to follow-up" and was there to reestablish care.  (Tr. 298.)  He indicated that Kelley had a "history of non-compliance, perhaps even self-neglect" but was "here now with major changes in life," including quitting work due to an alleged hostile work environment.  (*Id*.)  Dr. Solis noted that Kelley complained of anxiety and "some insomnia," but no daytime sleepiness or excessive fatigue.  (*Id*.)  Kelley was "not worried about her memory" and was "still able to care for activities of daily living, as well as capable of being a mother to her 8-year-old daughter."  (*Id*.)  She reported smoking up to one pack a day.  (*Id*.)  Kelley also reported a history of ulcerative colitis but indicated no current abdominal pain, diarrhea, apparent blood in her stool, persistent nausea, or dramatic weight loss.  (*Id*.)

On examination, Dr. Solis noted that Kelley was alert and in no acute distress, in "better spirits, more receptive," and "not at all unkempt."  (Tr. 300.)  He noted "only minimal epigastric, no suprapubic, no rebound tenderness" in Kelley's abdomen, with "no masses appreciated." (*Id*.)  Kelley's mood and affect were normal.  (*Id*.)  Dr. Solis diagnosed ulcerative colitis, fatigue, chronic low back pain, depression with anxiety, and tobacco use disorder.  (*Id*.)  He prescribed Alprazolam, Bupropion, and Paroxetine; ordered blood work; and counseled Kelley regarding her heavy smoking. (Tr. 302.)

On April 3, 2018, Kelley presented to gastroenterologist Kimberly Harris, M.D., to establish care.  (Tr. 253-254.)  Kelley stated that she was diagnosed with ulcerative colitis at age 19 after developing weight loss and rectal bleeding.  (*Id*.)  She was treated with medication but stopped taking it in 2013 when she started feeling better after eliminating red meat from her diet.  (*Id*.)  Kelley indicated that she had developed right lower quadrant pain and fever four weeks prior to her visit.

4

(*Id*.)  On examination, Dr. Harris noted that Kelley appeared well nourished with no signs of acute distress.  (*Id*.)  Dr. Harris observed positive bowel sounds in all quadrants, and stated that Kelley's abdomen was soft, nontender, and nondistended without guarding, rigidity, or rebound tenderness. (*Id*.)  Dr. Harris diagnosed ulcerative colitis, unspecified, without complications.  (*Id*.)  She ordered a colonoscopy with biopsy.  (*Id*.)

Kelley underwent the colonoscopy on April 10, 2018, which revealed "a diffuse area of moderately erythematous, friable (with contact bleeding) and ulcerated mucosa" in the entire examined colon.  (Tr. 255-258.)  A biopsy was taken, and a stool sample was sent for examination for C. Difficile ("C. Diff.") toxin.  (*Id*.)  The lab results showed that Kelley was positive for C. Diff. (Tr. 259.)  The biopsy showed lymphocytic colitis.  (Tr. 262.)  Kelley was started on Lialda and a fourteen-day course of Vancomycin.  (*Id*.)

On June 5, 2018, Dr. Harris noted that Kelley had completed her course of Vancomycin and was still on Lialda.  (Tr. 262.)  She indicated that Kelley had one solid bowel movement per day, occasional bloating, and one episode of bleeding that was resolved.  (*Id*.)  She stated that Kelley was "overall[] much better than before."  (*Id.*)

Kelley returned to Dr. Harris on October 2, 2018.  (Tr. 262-264.)  Kelley reported that she had been "doing very well" up until four weeks ago.  (Tr. 262.)  At that time, she developed diffuse abdominal pain that would come and go, last for a few days, and then resolve.  (*Id*.)  Kelley stated that the pain was waking her up at night and nothing seemed to make it better.  (*Id*.)  She also stated that she had developed diarrhea.  (*Id*.)  On examination, Dr. Harris stated that Kelley appeared well nourished with no signs of acute distress.  (Tr. 263.)  She noted diffuse abdominal tenderness but no rigidity, distention, or abdominal masses.  (*Id*.)   Dr. Harris diagnosed (1) ulcerative colitis,

unspecified, without complications; (2) generalized abdominal pain; and (3) change in bowel habit. (Tr. 264.)  She ordered lab work to check for C. Diff.; an upper GI endoscopy; and a flexible sigmoidoscopy.  (*Id*.)

Kelley underwent the endoscopy on December 3, 2018.  (Tr. 265.)  The following findings were noted:

> No endoscopic abnormality was evident in the esophagus to explain the patient's complaint or dysphagia. Biopsies were obtained from the proximal and distal esophagus with cold forceps for histology of suspected eosinophilic esophagitis. *** Mild inflammation characterized by adherent blood, congestion (edema), erythema and granularity was found in the gastric antrum. Biopsies were taken with a cold forceps for histology. *** The examined duodenum was normal.

(*Id*.)  On that same date, Kelley also underwent a flexible sigmoidoscopy, which revealed inflammation in the distal rectum and internal Grade II hemorrhoids.  (Tr. 268.)  Biopsies of Kelley's distal esophagus showed mild chronic inflammation.  (Tr. 271.)  Biopsies of her stomach, proximal esophagus, and rectosigmoid showed no significant pathologic changes.  (Tr. 271-272.)

On February 4, 2019, Kelley returned to Dr. Solis with complaints of tingling in her right arm. (Tr. 283-296.)  In addition, Kelley stated that she had been "struggling with bloating [and] abdominal distress." (Tr. 283.)  She reported that she was taking Mesalamine (also known as Lialda) for her ulcerative colitis and had "some modest weight gain."  (*Id*.)  Kelley denied vomiting, blood in her stool, anorexia, and nausea.  (*Id*.)  On examination, Dr. Solis noted that Kelley was "thin, but not cachectic" and "not in distress or diaphoresis."  (Tr. 285.)  He also stated that she was "in good spirits," amiable, and "not unkempt" and that her mood was "normal, cheerful, and appropriate." (*Id*.)  With regard to Kelley's abdomen, Dr. Solis noted positive bowel sounds and that she was "perhaps minimally distended."  (*Id*.)

6

Dr. Solis diagnosed (1) paresthesia of right upper extremity; (2) ulcerative colitis; (3) depression with anxiety; and (4) tobacco use disorder.  (Tr. 294.)  He continued her on Paroxetine and Bupropion; prescribed Gabapentin; and ordered blood work and an EMG and nerve conduction study. (Tr. 294-296.)  Dr. Solis noted that Kelley had been "diagnosed with exacerbation and flareup of ulcerative colitis" and that she was "miserable with symptoms, but seemingly managing with mesalamine, with modest weight gain."  (Tr. 296.)  He again counselled Kelley regarding smoking cessation, advising her that smoking "makes your belly symptoms worse." (*Id*.)

Kelley returned to Dr. Solis on March 27, 2019 with complaints of reflux symptoms.  (Tr. 318-329.)  Dr. Solis noted "fortunately, no apparent weight loss; no apparent blood in stool," and "no lingering anorexia or nausea." (Tr. 322.)  On examination, he noted that Kelley was "minimally anxious" and "minimally dysthymic" but "otherwise appropriate." (Tr. 324.)  Dr. Solis diagnosed (1) gastroesophageal reflux disease ("GERD"); (2) ulcerative colitis; (3) depression with anxiety; and (4) tobacco use disorder.  (Tr. 327.)   Kelley was prescribed Ranitidine, Sodium Bicarbonate, Gaviscon, Metoclopramide, and Bupropion.  (Tr. 328-329.)  Dr. Solis again advised Kelley that "smoking increases your chances of belly distress by increasing acid, and also relaxing the sphincter or purse string that stops the acid from rising up your esophagus."  (Tr. 329.)  He advised her to "cut down on smoking" and prescribed Chantix.  (*Id*.)

On May 7, 2019, Kelley returned to Dr. Harris.  (Tr. 359-361.)  Dr. Harris noted that Kelley's endoscopy showed mild chronic inflammation and that her gastric and sigmoidoscopy biopsies were normal.  (Tr. 359.)  With regard to Kelley's colitis, Dr. Harris noted that "[patient] continues to be in symptomatic remission on Lialda," with "[o]ne formed bowel movement daily without bleeding, mucus, or abdominal pain."  (*Id*.)  Kelley presented "today to discuss ongoing issues with heartburn,"

7

including burning pain, nausea, loud stomach noises, and fatigue. (*Id*.) Kelley reported that Zantac and Antacids had provided no relief and that dicyclomine "helps a little." (*Id*.)  She also indicated that she was prescribed Zofran, Reglan, and Sucralfate but reported that she had "not taken these." (*Id*.)

On examination, Dr. Harris noted that Kelley appeared well nourished with no signs of acute distress.  (Tr. 360.)  With regard to Kelley's abdomen, Dr. Harris noted positive bowel sounds in all quadrants and tenderness in the epigastrum, but no rigidity, distention, or abdominal masses.  (*Id*.) Dr.  Harris diagnosed (1) ulcerative (chronic) rectosigmoiditis without complications; and (2) GERD without esophagitis. (*Id*.) She continued Kelley on Lialda and ordered blood work and a repeat colonoscopy in 2020.  (*Id*.)

On July 23, 2019, Kelley presented to Robert Berkowitz, M.D., with complaints of right-sided neck pain and right arm pain, numbness, and tingling.  (Tr. 396-397.)   Among other things, Kelley reported "no bowel or bladder complaints."  (Tr 396.)  On examination, Dr. Berkowitz noted that Kelley was well nourished, well kept, alert and oriented, and with normal affect.  (Tr. 397.)  He diagnosed cervical radiculopathy and ordered physical therapy and an EMG nerve conduction study. (*Id*.)  Kelley returned to Dr. Berkowitz on September 3, 2019, with complaints of continued pain in her neck and right arm.  (Tr. 394-395.)  She reported "no bowel or bladder complaints" and "no fevers, chills, nausea, [or] vomiting."  (Tr. 394.)  Dr. Berkowitz noted that Kelley's EMG results were normal and ordered an MRI of her cervical spine.  (Tr. 395.)

On September 20, 2019, Kelley returned to Dr. Solis, who noted as follows:

Somewhat lost to follow-up.  In the interim, seen by Dr. Harris, GI, with medications adjusted, patient switched over from H2 blocker to unrecalled proton pump inhibitor, perhaps pantoprazole. Continued on mesalamine. Taking when necessary dicyclomine.  Has had modest appetite, but also, some continued modest weight gain.

> Otherwise, abdominal distress controlled, no apparent blood in stool.  No diarrhea, no constipation.  *** Constitutionally, no fever, no chills.  No night sweats. No lingering anorexia or nausea. ***

(Tr. 421.)  Dr. Solis also noted that Kelley continued to smoke one half pack per day.  (*Id.*)  He indicated that Kelley "does want to quit but does not feel she is ready" and noted that Kelley "never started Chantix." (*Id.*)

On examination, Dr. Solis found that Kelley was alert, receptive, oriented, amiable, and "in good spirits." (Tr. 423.)  Examination of Kelley's abdomen was normal, with no bruits, normal bowel sounds, soft, non-tender, no abdominal masses.  (*Id.*)  Her mood was normal, "relatively cheerful," and appropriate.  (*Id.*)  Kelley's drug screen was positive for marijuana.  (Tr. 426.)  She admitted that "in the past she does marijuana for abdominal distress, although it is not a prescription." (*Id.*)  Dr. Solis diagnosed (1) weight gain; (2) leukocytosis; (3) polymyalgia; (4) inflammatory bowel disease; (5) paresthesia of right upper extremity; and (6) tobacco use disorder.  (Tr. 427.)  He continued Kelley on her medications and advised her to restart Bupropion.  (Tr. 429.)

Kelley returned to Dr. Harris on December 2, 2019, with complaints of "burning discomfort in her stomach." (Tr. 406-408.)  She stated that "she thought Mesalamine might be causing her symptoms so she decreased it" from six to three tablets daily, and then started experiencing bowel irregularity.  (Tr. 406.)  Kelley reported that she was still smoking half a pack of cigarettes a day. (Tr. 407.)  On examination of Kelley's abdomen, Dr. Harris noted positive bowel sounds in all quadrants and tenderness in the epigastrum, but no rigidity or distention.  (Tr. 408.)

Dr. Harris diagnosed (1) ulcerative (chronic) rectosigmoiditis without complications; and (2) epigastric pain.  (Tr. 408.)  She noted that Kelley's ulcerative colitis was "previously in remission on mesalamine" but that Kelley "recently cut back on her dose with resultant increasing bowel

9

irregularity." (*Id.*) Dr. Harris ordered blood work and "discussed GI symptoms associated with [marijuana] use and advised avoidance for these reasons." (*Id.*)

The following month, Kelley returned to Dr. Solis for an evaluation for her disability application. (Tr. 372, 373.) In relevant part, Dr. Solis noted as follows:

> The patient is here for reevaluation of her disability, mainly from her inflammatory bowel disease. She is also being followed closely by [gastro]enterology. Seen 2 weeks ago, with medications adjusted, continued on anti-inflammatory regimen, proton pump inhibitor, with antispasmodic increased, now taking DICYCLOMINE 20 mg by mouth 4 times a day as needed.

> Unfortunately, the patient continues to smoke, even as she does understand that smoking increases her GI symptoms, mainly increasing spasms. She is trying to minimize her smoking, now perhaps only 6 cigarettes a day. She also is exposed to marijuana in the form of smoke, sometimes ingested. Initially, the patient was being evaluated actually for controlled substance agreement for benzodiazepine, but she does understand now that with use of marijuana, she had to make a choice. She pointed out that marijuana seems to help her symptoms better, and has since postponed being on any benzodiazepine. No confusion or delirium. Patient not worried about her memory. Remaining in good spirits. Hopeful about more help for her disability.

> Continues with GI symptoms, mainly anorexia, nausea, but no vomiting. Abdominal distress, pain mainly affecting the left side. Episodes of bright red blood in stool. No black stools. No fever, no chills. Occasional urgency, frequency, but no dysuria, flank, suprapubic pain. ***

(Tr. 373.) On examination, Dr. Solis noted that Kelley was "minimally anxious" but not in distress. (Tr. 376.) He further noted that she was alert, oriented, amiable, cheerful, appropriate, and not unkempt. (*Id.*) With regard to Kelley's abdomen, Dr. Solis noted positive bowel sounds, softness with some epigastric tenderness, and left-sided pain at the level of umbilicus. (*Id.*)

### C. Opinion Evidence

#### 1. Physical Impairments

On March 4, 2019, state agency physician Maureen Gallagher, D.O., opined that Kelley could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand

and/or walk for about six (6) hours in an eight-hour workday; and sit for about six (6) hours in an eight-hour workday.  (Tr. 67.)  Dr. Gallagher further opined that Kelley had an unlimited ability to push and/or pull, climb ramps/stairs, and balance, but could only frequently climb ladders/ropes/scaffolds, stoop, kneel, crouch and crawl.  (Tr. 67-68.)  Dr. Gallagher found that Kelley had no manipulative, visual, communicative, or environmental limitations. (Tr. 68.)  On May 31, 2019, state agency physician Linda Hall M.D., affirmed Dr. Gallagher's findings.  (Tr. 99-100.)

On January 2, 2020, Dr. Solis completed a "Crohn's & Colitis Residual Functional Capacity Questionnaire" regarding Kelley's physical functional limitations.  (Tr. 366-370.)  Dr. Solis indicated that Kelley had diagnoses of ulcerative colitis with rectal bleeding, GERD, and anxiety with depression.  (Tr. 366.)  He listed symptoms of abdominal pain and cramping, bloody diarrhea, loss of appetite, malaise, and fatigue, and described her prognosis as stable. (*Id*.)  Dr. Solis stated that Kelley's impairment was "constant with episodes of flare-ups related to eating, stress, [and] smoking." (Tr. 367.)  He opined that Kelley was not a malingerer, and that her impairments lasted, or could be expected to last, at least twelve months.  (*Id*.)

With regard to Kelley's specific functional limitations, Dr. Solis opined that Kelley could (1) occasionally lift and carry less than ten pounds; (2) stoop 15% of an eight hour workday; (3) crouch 10% of an eight hour workday; (4) stand and/or walk for a total of less than two hours in an eight-hour workday (with normal breaks); and (5) sit for a total of about four hours in an eight-hour workday (with normal breaks).[6]  (Tr. 369-370.)  He further found that Kelley would need a job that permitted (1) shifting positions at will from sitting, standing, or walking; and (2) ready access to a

---

[6] Dr. Solis also opined that Kelley could stand continuously for 15 minutes at one time and sit continuously for 1 hour at one time.  (Tr. 368.)

restroom.  (Tr. 369.)  Dr. Solis opined that Kelley would need 1-2 unscheduled restroom breaks a day, at least 2 to 3 times per week; and that each break would last an average of 30 minutes.  (*Id*.)  He also found that she would need to lie down or rest at unpredictable intervals," at least 3 times per week for an average of 20 minutes each time before recovery.  (*Id*.)  Lastly, Dr. Solis stated that Kelley was likely to be absent about three times a month as a result of her impairments or treatment. (Tr. 370.)

### 2.  Mental Impairments

Ronald G. Smith, Ph.D., performed a consultative psychological evaluation of Kelley on February 26, 2019.  (Tr. 306.)  In an opinion dated March 1, 2019, Dr. Smith noted as follows.  (Tr. 306-311.)  Kelley reported that she lives with her ten-year old daughter.  (Tr. 306.)  She worked as a restaurant manager at the Texas Roadhouse for 16 years (until May 2017) and then worked as a server at Red Lobster until March 5, 2018.  (Tr. 307.)  She left Red Lobster to go on unpaid medical leave because of her ulcerative colitis.  (*Id*.)  Kelley explained that she had suffered from colitis since she was 19 years old and had "dealt with it mainly by the use of medication."  (*Id*.)  Her symptoms included "burning stomach," bloating, cramping, bloody diarrhea, and the need for frequent restroom breaks.  (Tr. 308.)  Kelly also stated that she suffered from "bad anxiety." (Tr. 306.)  She indicated that she was hospitalized for attempted suicide when she was 16 years old but that "she's not had any other psychiatric treatment or counseling and she's never been hospitalized since then, nor has she ever made a suicide attempt since then."  (Tr. 308.)

On mental status examination, Kelley was neat and clean in her appearance and cooperative with Dr. Smith.  (*Id*.)  She was alert, well oriented and in good contact with reality.  (Tr. 309.) Kelley's responses "were direct and to the point and her thinking was well organized."  (Tr. 308.)

She showed appropriate affective expression with a good range of affect. (Tr. 309.) Kelley indicated that she cries five times a week and "she gets anxious as soon as she opens her eyes and she feels afraid." (*Id*.) Kelley further stated that she "sleeps a lot in the daytime and if there's anything that goes out of her routine '[she] freak[s].'" (*Id*.)

Despite her daytime sleeping, Kelley stated that "she does get things done that she needs to do around the house most days." (*Id*.) Dr. Smith described Kelley's self-reported activities of daily living, as follows:

> These days she's up at 7 in the morning. She sits and holds her dogs and she does some laundry during the day. She might run to the store for a short trip and make her daughter's lunch. She cleans her house. When asked if she goes anywhere, she said she might go to her mom's house which is 20 minutes away. She does not eat in restaurants because of her colitis and also she feels because of the harassment that she's experienced in a restaurant environment.

(Tr. 310.) Kelley drove herself to her appointment with Dr. Smith and "said she had no trouble driving in the daytime." (Tr. 306.)

Dr. Smith diagnosed (1) persistent depressive disorder (dysthymia) with pure dysthymic syndrome; and (2) adjustment disorder with anxiety. (Tr. 310.) He assessed the following regarding the four, broad areas of mental functioning:

**1.     Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions**.

> On a mental basis, Jennifer Kelley would appear to be capable of understanding and remembering job instructions. Her ability to carry them out successfully will be hampered by her worry and anxiety.

**2.     Describe the claimant's abilities and limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.**

13

Mentally she may have trouble maintaining adequate attention and concentration and maintaining persistence in the performance of simple or more complex tasks due primarily to anxiety.

**3.     Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

On a mental basis she should be able to respond appropriately to supervision and coworkers in a job setting.

**4.     Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

Mentally she may have some difficulty dealing appropriately with work pressures in a job situation due to her tendency to worry excessively and her feelings of anxiety.

(Tr. 310-311.)  Dr. Smith also concluded that Kelley "would appear to be capable of handling funds if they were awarded." (Tr. 311.)

Subsequently, on March 5, 2019, state agency psychologist Lisa Foulk, Psy.D., completed a Mental RFC Assessment regarding Kelley's mental psychological functioning.  (Tr. 64-65, 68-70.) Dr. Foulk opined that Kelley had (1) no limitations in understanding, remembering, or applying information; (2) mild limitations in interacting with others; and (3) moderate limitations in maintaining concentration, persistence, or pace, and adapting or managing herself.  (Tr. 64.) Specifically, Dr. Foulk concluded that Kelley had moderate limitations in her abilities to: (1) maintain attention and concentration for extended periods; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (3) respond appropriately to changes in the work setting. (Tr. 68-70.) Dr. Foulk found that Kelley was "capable of sustaining concentration and persistence on tasks in a setting void of fast-pace demands" and "capable of adapting to infrequent changes in a static work setting."  (Tr. 69-70.)

14

On June 6, 2019, state agency psychologist Vicki Warren, Ph.D., affirmed Dr. Foulk's assessment. (Tr. 96, 101-102.)

### D. Hearing Testimony

During the May 11, 2020 hearing, Kelley testified to the following:

- She worked at Texas Roadhouse from February 2002 until May 2017, first as a food server and then as a service manager. (Tr. 35-38.) She left this job because she was sexually harassed by her boss. (Tr. 37.) She then worked as a food server at Red Lobster for eight months. (Tr. 38.) She left her job at Red Lobster because she had a flare-up of her ulcerative colitis. (Tr. 38.)

- She was first diagnosed with ulcerative colitis when she was 19 years old. (Tr. 38-39.) She took medication for this condition and it "went into remission" and she "kind of got back to normal." (Tr. 39.) However, in 2018, her ulcerative colitis flared up and it was "really horrible." (Tr. 38.) She felt like she had a "working volcano" in her stomach. (*Id*.)

- She had a hysterectomy in June 2018, which she hoped might help with her symptoms. (Tr. 38-39, 40-41.) However, she has not "bounced back" and she doesn't know why. (Tr. 40-41.) Her symptoms include stomach pain/burning, diarrhea, frequent need to use the bathroom, "excruciating gas pains," and fatigue. (Tr. 43-44, 47.) She does not have solid stools anymore and they are often bloody. (Tr. 47.) Sometimes she needs to use the bathroom six to seven times per day, which makes her dehydrated. (*Id*.) Her weight has fluctuated between 132 and 150 pounds. (*Id*.)

- She takes Mesalamine (6 tablets/day), Doxycycline, and Protonix for her ulcerative colitis. (Tr. 40.) She has had C. Diff. three times since March 2018. (Tr. 42.) She takes Fluoxetine for her mental health issues. (Tr. 42-43.) She stopped smoking cigarettes and using marijuana in January 2020. (Tr. 48.)

- On a typical day, she goes to bed at 10 p.m. and wakes up at 3:00 a.m. due to her stomach issues. (Tr. 44.) She is usually awake from 3:00 to 4:00 a.m., and then goes back to sleep until 6:00 or 7:00 a.m. (*Id*.) When she wakes up in the morning, her stomach is burning and she needs to take medication and lie down for 45 minutes. (*Id*.) She then takes a shower, gets her eleven year old daughter up for homeschooling, and lays down again. (*Id*.) She feels tired all the time. (Tr. 45.) She lies down two to three times per day, for an hour each time. (*Id*.)

- During the course of the day, she does laundry, tries to clean the house, prepares meals for her daughter, and helps her daughter with her homework. (Tr. 45.) Sometimes her mother comes over to help. (*Id*.)

15

- She clarified that, although her disability application says that her onset date is March 5, 2017, it should be March 5, 2018.  (Tr. 51-52.)

The ALJ first asked the vocational expert ("VE") to characterize Kelley's past relevant work. (Tr. 49.)  The VE testified that Kelley had past work as a Dining Room Manager (light, skilled, SVP 6).  (*Id*.)  The ALJ then posed the following hypothetical question:

> Hypothetical #1:  assume an individual who can engage in light exertion; who can frequently climb ladders, ropes, and scaffolds; frequently stoop, kneel, crouch, and crawl; and no other limitations.  How would -- could that person return to the Claimant's past work?

(Tr. 52.)  The VE testified that the hypothetical person could perform Kelley's past relevant work as a Dining Room Manager.  (*Id.*)

The ALJ then asked the VE a second hypothetical that was the same as the first but added the restriction that "the person is off-task 10% of the day, exclusive of breaks."  (*Id*.)  The VE testified that the hypothetical person could still perform Kelley's past relevant work as a Dining Room Manager.  (*Id*.)

The ALJ then asked the VE a third hypothetical that was the same as the first but added the restriction that the person would miss work, come in late one day, or leave work early one day, one day per month.  (Tr. 52 - 53.)  The VE testified that the hypothetical person could still perform Kelley's past relevant work as a Dining Room Manager but noted that more than one of these events per month "generally results in a write-up or some sort of supervisory action." (Tr. 53.)

Kelley's attorney then asked the VE whether missing more than one day of work per month, or not being able to complete a full day of work more than once per month, would eliminate Kelley's past work experience and/or all jobs.  (Tr. 53-54.)  The VE responded that it would eliminate all jobs. (Tr 54.)  Finally, Kelley's attorney asked whether unscheduled restroom breaks lasting for thirty

16

minutes, once or twice per day, would be tolerated. (Tr. 54.) The VE responded that such restroom breaks would not be tolerated. (Tr. 54-55.)

## III.    Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a). A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. *See* 20 C.F.R. 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 404.1520. First, the claimant must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of

17

impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Before considering step four, the ALJ must determine the claimant's residual functional capacity, i.e., the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  20 C.F.R. § 404.1520(e) and 416.930(e).  At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbot*, 905 F.2d at 923.

Here, Kelley was insured on her alleged disability onset date and remained insured through December 31, 2023, her date last insured ("DLI").  (Tr. 14.)  Therefore, in order to be entitled to POD and DIB, Kelley must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  Summary of Commissioner's Decision

The ALJ made the following findings of fact and conclusions of law:

1.    **The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.**

2.    **The claimant has not engaged in substantial gainful activity since March 5, 2017, the alleged onset date (20 CFR 404.1571 and 416.971 *et seq.*).**

3.      The claimant has the following severe impairments: ulcerative colitis and irritable bowel syndrome (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work[7] as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations:  frequently climb ladders, ropes, and scaffolds and frequently stoop, kneel, crouch, and crawl.

6.      The claimant is capable of performing past relevant work as a dining room manager.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from March 5, 2017, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 14-22.)

## V.    Standard of Review

The Court's review of the Commissioner's decision to deny benefits is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as

---

[7] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. 404.1567(b).

19

adequate to support a conclusion.'" *McGlothin v. Comm'r of Soc. Sec.*, 299 Fed. Appx. 516, 521 (6th Cir. 2008) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal citation omitted)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 at * 6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011), *report and recommendation adopted*, 2011 WL 6122758 (S.D. Ohio Dec. 8, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010).

## VI.     Analysis

### A.      Kelley's First Assignment of Error: The ALJ's Evaluation of her Subjective Complaints

In her first assignment of error, Kelley argues that the ALJ failed to properly evaluate her subjective complaints under Social Security Ruling ("SSR") 16-3p.  (Doc. No. 15 at pp. 13-18.) Kelley argues that, although the ALJ acknowledged some of her symptoms, "the ALJ failed to provide an analysis or explanation [of] how they were considered when evaluating the limiting effects of those symptoms."  (*Id.* at p. 16.)  Specifically, Kelley asserts that the ALJ erroneously: (1) relied upon the fact that she did not have a colonoscopy until 2018 (despite suffering from ulcerative colitis since she was 19) to support the ALJ's conclusion that Kelley's statements regarding her pain were not consistent with the medical records; (2) failed to acknowledge that a fluctuation in symptoms is a hallmark of her ulcerative colitis; (3) relied upon irrelevant medical records indicating that Kelley had a normal gait; and (4) considered Kelley's cigarette and marijuana use to Kelley's detriment, despite the fact that Kelley quit using both substances and one of her doctors indicated that Kelley should "look into getting medical marijuana."  (*Id.*)  Lastly, Kelley argues that the ALJ failed to properly take into consideration many of the factors outlined in SSR 16-3p, such as the nature of her activities of daily living, the side effects of her medication, and her frequent need to use the restroom. (*Id.* at pp. 17-18.)

The Magistrate Judge agreed with Kelley, finding that "the district court should not uphold the ALJ's decision because – even if there is enough evidence in the record to support the ALJ's decision – the ALJ did not 'build an accurate and logical bridge between the evidence and the result.'" (Doc. No. 23 at p. 22) (quoting *Fleischer*, 774 F. Supp. 2d at 877).  Specifically, the Magistrate Judge determined that remand is required because the ALJ failed to adequately explain how medical records

21

indicating that Kelley had a normal gait and that her abdominal distress was under control at times, were inconsistent with Kelley's diagnoses or her testimony.[8]  (*Id*. at p. 23.)

The Commissioner objects to the Magistrate Judge's conclusion, arguing that the ALJ "reasonably considered Plaintiff's allegations regarding her bathroom needs and alleged sleepiness and explained how those allegations conflicted with the objective evidence and Plaintiff's own reports about her symptoms thereby building a logical bridge between the evidence and result."  (Doc. No. 24 at p. 3.)  The Commissioner asserts that the Magistrate Judge improperly found that the ALJ relied on Kelley's normal gait in evaluating her subjective symptoms, noting that the ALJ also fully evaluated specific evidence directly related to Kelley's bathroom needs, as well as evidence regarding her improvement with treatment and her medication side effects.  (*Id*. at pp. 2-3.)  In response, Kelley argues that the Magistrate Judge correctly concluded that remand is necessary because the ALJ failed to properly explain her reasons for discounting Kelley's subjective complaints of disabling symptoms.  (Doc. No. 25.)

As the Commissioner has objected to the R&R, the Court will conduct a *de novo* review of Kelley's first assignment of error, below.[9]

---

[8] In addition, the Magistrate Judge also found that, although Kelley clarified during the hearing that her onset date was March 5, 2018, the ALJ decision appears to have assumed that Kelley had an onset date of March 5, 2017.  (*Id*. at pp. 22-23.) The Magistrate Judge found that it was unclear whether "the ALJ determined that the discrepancy between the alleged onset date and Kelley's last day of work undermined Kelley's statements concerning the intensity, persistence, and limiting effects of her symptoms."  (*Id*.)  In her Objection, the Commissioner argues this finding is in error because (1) Kelley herself states that her alleged onset date is March 5, 2017 in her Brief on the Merits; (2) Kelley never argued that any dispute over her alleged onset date played a role in the ALJ's analysis of her subjective statements; and (3) the ALJ explicitly set forth evidence from 2018 and 2019 in reaching her conclusions.  (Doc. No. 24 at p. 4.)  The Court agrees that Kelley failed to raise any argument regarding the ALJ's alleged use of the wrong onset date in her Brief on the Merits and, therefore, she waived this issue.  Moreover, in her Response to the Commissioner's Objection, Kelley agrees that it would be an idle and useless formality to remand this case on this basis.  (Doc. No. 25 at p. 5.)  Accordingly, the Court will not consider this issue herein.

[9] Under 28 U.S.C. § 636(b)(1), "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see Powell v.*

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms.  *See Moore v. Comm'r of Soc. Sec.,* 573 Fed. Appx. 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).[10]

In evaluating a claimant's symptoms at the second step of the analysis, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  Beyond medical evidence, there are seven factors that the ALJ should consider.  These factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes

---

*United States*, 37 F.3d 1499 (Table), 1994 WL 532926 at *1 (6th Cir. Sept. 30, 1994) ("Any report and recommendation by a magistrate judge that is dispositive of a claim or defense of a party shall be subject to *de novo* review by the district court in light of specific objections filed by any party.") (citations omitted); *Orr v. Kelly*, 2015 WL 5316216 at *2 (N.D. Ohio Sept. 11, 2015). *See also* Fed. R. Civ. P. 72(b)(3). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. §636(b)(1).

[10] The Social Security Administration ("SSA") previously characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination. *See* SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996).  In March 2016, however, the SSA issued SSR 16-3p. Therein, the SSA explained that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-regulatory policy.  *See* SSR 16-3p, 2016 WL 1119029 (Oct. 25, 2017). The SSA explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record. SSR 16-3p, 2016 WL 1119029.  Despite these changes in terminology, courts have concluded that SSR 16-3p did not substantially change existing law on this issue. *See Banks v. Comm'r of Soc. Sec.*, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting language in SSR 16-3p that states intention to "clarify" and not to substantially "change" existing SSR 96-7p), *adopted at* 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7.

The ALJ is not required to discuss each of these factors or even all the evidence in the record but need only acknowledge the factors and discuss the evidence that supports her decision. *See Bryson v. Comm'r of Soc. Sec.*, 2021 WL 2735993 at * 14 (N.D. Ohio June 10, 2021), *adopted by,* 2021 WL 2720071 (N.D. Ohio July 1, 2021). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029 at * 9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. *See also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

An ALJ is not required to accept the claimant's complaints at face value but may discount them based on her consideration of the above factors. *See Dooley v. Comm'r of Soc. Sec.*, 656 Fed. Appx. 113, 119 (6th Cir. 2016); *Bryson*, 2021 WL 2735993 at * 15. In light of the ALJ's opportunity to observe the claimant's demeanor, the ALJ's evaluation of a claimant's subjective symptoms is entitled to considerable deference and should not be discarded lightly. *See Dooley*, 656 Fed. Appx.

24

at 119 ("[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'") (quoting *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)).  *See also Walters v. Comm'r. of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Jidas v. Comm'r of Soc. Sec.,* 2019 WL 2252289 at * 8-9 (E.D. Mich. Feb. 26, 2019), *adopted by,* 2019 WL 1306172 (E.D. Mich. March 22, 2019).  Indeed, a reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  *See also Biestek v. Comm'r of Soc. Sec.,* 880 F.3d 778, 788 (6th Cir. 2017) (noting that "while an ALJ's credibility determinations must be supported by substantial evidence, we accord them special deference"); *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. Appx 468, 476 (6th Cir. 2016) (noting that, "in practice ALJ credibility findings have become essentially 'unchallengeable.'); *Riebe v. Comm'r of Soc. Sec.*, 2019 WL 4600628 at * 7-8 (N.D. Ohio Sept. 23, 2019) (same).

For the following reasons, the Court concludes that the ALJ properly evaluated Kelley's subjective complaints under SSR 16-3p.  In the decision, the ALJ acknowledged Kelley's complaints of abdominal pain, nausea, diarrhea, frequent need to use the restroom, heartburn, and fatigue.  (Tr. 18-19.) The ALJ expressly found that Kelley's medically determinable impairments could reasonably be expected to cause her alleged symptoms but concluded that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 18.)  In particular, the ALJ noted as follows:

> [T]he claimant has a history of being diagnosed with ulcerative colitis at age 19. Yet, she reported never having a colonoscopy until symptoms increased in March 2018. The claimant was evaluated by a gastroenterologist in April 2018 after experiencing right lower quadrant pain and fever for approximately four weeks. On examination, there were positive bowel sounds in all quadrants and abdomen was soft, nontender, and nondistended without guarding, rigidity, or rebound tenderness. There were also

no abdominal masses palpable and no palpable hepatosplenomegaly. The claimant also walked with a normal gait and no focal deficits were appreciated.

On April 10, 2018, she had her first colonoscopy. The physician at North Shore Endoscopy Center documented the claimant "currently not on any treatment for her UC. For the past 6 days has been having bloody diarrhea." On examination, the perianal and digital rectal examinations were normal, no fistulas or skin tags. The colonoscopy revealed a diffuse area of moderately erythematous, friable and ulcerated mucosa along the colon. The terminal ileum appeared normal, and there were no additional abnormalities on retroflexion. She was started on medications and advised to follow up with Dr. Harris in two weeks. (See Exhibit 1F/ 4). Stool collected during the procedure was also positive for clostridium difficile infection. The claimant was started on medication and by June 2018, the claimant reported improvement with just one episode of bleeding, which resolved and occasional bloating. On follow-up in October 2018, the claimant reported a 4-week history of symptom exacerbation including occasional abdominal pain and diarrhea (Exhibit 1F at 11). There was some diffuse abdominal tenderness; however, the remainder of her examination was unchanged.

The claimant underwent an upper GI endoscopy in December 2018, which demonstrated mild chronic inflammation in the distal esophagus, but with a normal gastric biopsy (Exhibit 1F at 14). There was also a normal biopsy with flexible sigmoidoscopy (Exhibit 1F at 17).

Treatment records from May 2019 document she was in "symptomatic remission" with Lialda medication. She had normal bowel movements without any bleeding. Mucus or abdominal pain. (Exhibit 6F at 2 and 10F/ 3). However, she was experiencing heartburn with nausea. Physical examination documents she was well nourished, no acute distress, alert, cooperative; normal heart; positive bowel sounds in all 4 quadrants, no rigidity, non distended, positive tenderness in the epigastrium, no abdominal masses; walked with a normal gait, no jaundice and no focal neuro deficits. She denied dizziness, memory loss, paralysis, depression and anxiety. (Ex. 10F/4).

Although the claimant reported she did not immediately receive significant improvement in her symptoms, by her follow up visit in September 2019, her abdominal distress was controlled, and she denied diarrhea (Exhibits 5F at 8 and 11F at 13). Her abdominal findings were benign on examination (Exhibit 11F at 15). However, the claimant was still reporting little improvement in her stomach pain (Exhibit 10F at 8).

26

(Tr. 18-19.)  The ALJ also addressed Dr. Solis' January 2020 opinions, finding them less than fully persuasive "as they are not well supported and not consistent with his own examination findings." (Tr. 19-20.)

Upon careful consideration, and reading the decision as a whole, the Court rejects Kelley's argument that the ALJ failed to provide a sufficient analysis of her subjective complaints.  The ALJ addressed most, if not all, of the seven factors set forth in SSR 16-3p and adequately explained her reasoning.  Specifically, the ALJ considered the location, duration, and frequency of Kelley's symptoms, including her abdominal distress, diarrhea, and frequent need to use the restroom. However, the ALJ explained that Kelley's subjective complaints were inconsistent with the medical record by pointing to evidence that: (1) by June 2018, Kelley had improved with medication and treatment; and (2) although she had a flare up in October 2018, she was in "symptomatic remission" throughout much of 2019 with normal bowel movements and mostly benign abdominal findings.  (Tr. 19.)  The ALJ also expressly acknowledged Kelley's statement that she needed to use the bathroom six times a day (Tr. 18) but noted that treatment records indicated Kelley reported one bowel movement a day in June 2018, "symptomatic remission" in May 2019, and no diarrhea and controlled abdominal distress in September 2019.  (Tr. 19.)

The ALJ also considered the type, dosage, and effectiveness of Kelley's ulcerative colitis medications.  Specifically, the ALJ noted that Kelley was started on medication in April 2018 and, by June of that year, had reported improvement with just one episode of bleeding which had resolved. (Tr. 19.) The ALJ also noted that treatment records from May 2019 indicated that Kelley was in symptomatic remission with Lialda, with normal bowel movements and no bleeding.  (*Id*.)  The ALJ also addressed "any other measures other than treatment that the individual uses or has used to relieve

27

pain or symptoms," noting that Kelley continued to smoke marijuana despite the fact that Dr. Harris advised her that marijuana use could exacerbate her GI symptoms. (Tr. 15.) Lastly, earlier in the decision, the ALJ noted that Kelley had reported she was able to care for her activities of daily living, including caring for her young daughter. (Tr. 16.)

Substantial evidence supports the ALJ's findings. As discussed *supra,* in April 2018, Dr. Harris diagnosed Kelley with ulcerative colitis and started her on Lialda (also known as Mesalamine). (Tr. 253-254, 255-258, 262.) On June 5, 2018, Dr. Harris noted that Kelley was "overall much better" with one solid bowel movement per day, occasional bloating, and one episode of bleeding that had resolved. (Tr. 262.) Kelley reported "doing very well" until experiencing a flare-up in October 2018. (*Id.*) By March 2019, Kelley had improved, with no anorexia, nausea, weight loss, or apparent blood in her stool. (Tr. 322.) In May 2019, Dr. Harris noted that Kelley "continues to be in symptomatic remission with Lialda," with one bowel movement daily without bleeding or abdominal pain. (Tr. 359.) In July and September 2019, Kelley reported "no bowel or bladder complaints," including no nausea or vomiting. (Tr. 394, 396.) On September 20, 2019, Dr. Solis noted that Kelley's abdominal distress was controlled with no diarrhea, nausea, anorexia, or blood in her stool.[11] (Tr. 421.)

In addition, substantial evidence supports the ALJ's observation that Kelley continued to use marijuana even after Drs. Solis and Harris both advised her that smoking marijuana could exacerbate her GI symptoms. (Tr. 15.) Specifically, the record reflects that Dr. Solis advised her that smoking (including smoking marijuana) increases her GI symptoms. (Tr. 373.) Dr. Harris also "discussed GI

---

[11] Although Kelley reported a flare-up in December 2019, the Court notes that this was after Kelley decided to decrease her Lialda dosage. *See* Tr. 406 (in December 2, 2019 treatment note, Dr. Harris notes that Kelley "thought that her mesalamine might be causing her symptoms so she decreased from 6 >3 tabs daily. Since doing that, her BMs have become more irregular.") At that same visit, Kelley "admitted to THC use," despite the fact that her doctors had advised her that smoking marijuana could increase her GI symptoms. (Tr. 373, 406, 408.)

symptoms associated with THC use and advised avoidance for these reasons."  (Tr. 408.)  Although Kelley testified during the hearing that she stopped smoking cigarettes and marijuana in January 2020 (Tr. 48), the ALJ was not required to accept Kelley's statements at face value, particularly in light of treatment records indicating that Kelley continued smoking throughout 2018 and 2019 despite Dr. Solis' repeated warnings that doing so would exacerbate her symptoms.  (Tr. 296, 329, 373, 421.)  Moreover, the ALJ was entitled to consider Kelley's failure to heed her doctors' advice on this issue when evaluating her subjective complaints.  *See Sias v. Sec'y of Health and Human Servs*., 861 F.2d 475, 480 (6th Cir. 1988) (claimant's failure to stop smoking was inconsistent with his allegations of disabling pain and limitation).  *See also Barncord v. Comm'r of Soc. Sec.*, 2017 WL 4160886 at * 5 (S.D. Ohio Sept. 9, 2017) (finding that, in evaluating claimant's credibility, "[t]he ALJ was also entitled to consider plaintiff's failure to heed the advice of his doctors to quit smoking."); *Marshall v. Comm'r of Soc. Sec.,* 2014 WL 2587612, at *2 (E.D. Mich. June 10, 2014) ("The Sixth Circuit has routinely recognized that '[t]he failure to stop smoking against medical advice can properly be considered in assessing credibility.'") (citing *Hall–Thulin v. Comm'r of Soc. Sec*., 1997 WL 144237, at *1 (6th Cir. Mar. 27, 1997) ("It was not improper for the ALJ and the magistrate judge to consider the plaintiff's smoking history and her two-year delay in following her physician's advice to quit smoking.")

Substantial evidence also supports the ALJ's finding that Kelley reported she could perform her activities of daily living, including caring for her young daughter.  (Tr. 16.)  In February 2019, Kelley reported to Dr. Smith that "she does get things done that she needs to do around the house most days," including doing laundry, cleaning the house, making her daughter's lunch, running to the store, and driving.  (Tr. 306, 309-310.)  In addition, during the May 2020 hearing, Kelley similarly

testified that she does laundry, cleans the house, prepares meals for her daughter, and helps her daughter with homework. (Tr. 45.) Kelley's argument that the ALJ should have provided a more detailed discussion of this evidence is without merit. "[T]he fact that the ALJ did not cite to every piece of evidence in the record does not amount to reversible error, as it is well settled that '[a]n ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party.'" *Estrada v. Comm'r of Soc. Sec.*, 2017 WL 4106247 at * 3 (E. D. Mich. Aug. 4, 2017) (quoting *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)), *adopted by*, 2017 WL 4098888 (E.D. Mich. Sept,15, 2017). Here, substantial evidence supports the ALJ's finding that there was evidence in the record that Kelley could perform activities of daily living, including caring for her daughter.

Lastly, the Court respectfully disagrees with the Magistrate Judge's recommendation that remand is required because the ALJ failed to sufficiently explain the relevance of the fact that Kelley did not have a colonoscopy until 2018 and exhibited normal gait during medical appointments. The Magistrate Judge takes too narrow a view of the ALJ's decision. Although these specific observations, standing alone, might not sufficiently explain the ALJ's evaluation of Kelley's subjective complaints, a review of the decision as a whole reveals that the ALJ cited and discussed a great deal of other relevant, record evidence. As discussed at length above, the ALJ specifically acknowledged Kelley's symptoms (including her frequent need to use the restroom and fatigue) but also discussed her improvement with consistent treatment and medication, as well as her ability to perform various activities of daily living including caring for her young daughter. The fact that the ALJ did not also summarize her consideration of these factors in a single paragraph is not reversible error. *See Ferrell v. Comm'r of Soc. Sec.,* 2020 WL 6505055 at * 8 (N.D. Ohio Nov. 5, 2020); *Carr*

*v. Saul,* 2019 WL 3729265 at * 5 (N.D. Ohio Aug. 8, 2019). *See also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) (citation omitted) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.")).

In sum, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") The ALJ provided sufficiently specific reasons for her evaluation of Kelley's subjective symptoms and supported those reasons with reference to specific evidence in the record.

Accordingly, the Commissioner's Objection (Doc. No. 24) is well-taken and the Report & Recommendation (Doc. No. 23) is rejected with respect to Kelley's First Assignment of Error.

### B. Kelley's Second Assignment of Error: Failure to Include Non-Exertional Limitations in the RFC

In her Second Assignment of Error, Kelley argues that "the ALJ's failure to include any non-exertional limitations in the RFC warrants a remand and the ALJ's failure to properly evaluate the medical opinions requires a remand as well." (Doc. No. 15 at p. 19.) Kelley first asserts that the ALJ failed to explain why she failed to include any limitations relating to her mental impairments in the RFC. (*Id.* at p. 20.) She next argues that the ALJ failed to properly evaluate the medical opinions of Drs. Smith, Foulk, and Warren that she had moderate limitations in her abilities to maintain concentration, persistence, or pace, and adapting or managing herself. (*Id.* at pp. 20-22.) Lastly, with

regard to her physical impairments, Kelley argues that the ALJ failed to properly evaluate Dr. Solis's opinion that she would need to have ready access to a bathroom at will and would experience unscheduled restroom breaks throughout the day. (Tr. 22-24.) The Commissioner argues that the ALJ's RFC determination is supported by substantial evidence and that the ALJ properly evaluated the medical opinions evidence. (Doc. No. 19 at pp. 2-8.)

The Magistrate Judge did not address Kelley's Second Assignment of Error in the R&R, finding that it was unnecessary to do so in light of her recommendation that this matter should be remanded based on Kelley's First Assignment of Error. (Doc. No. 23 at p. 24.) This Court, however, has rejected the Magistrate Judge's recommendation and concluded that remand is not required with respect to Kelley's First Assignment of Error. Under these circumstances, this Court would normally re-refer this matter to the Magistrate Judge for evaluation of Kelley's remaining arguments. In the interest of judicial efficiency, and given how long Kelley's case has been pending, the Court elects, in this particular instance, to conduct a *de novo* review of Kelley's Second Assignment of Error rather than re-referring the case to the Magistrate Judge.[12]

### 1. Mental Impairments

The Court first addresses Kelley's arguments with respect to her mental impairments. At Step Two of the sequential evaluation process, the ALJ determined that Kelley's depression and anxiety "considered singly and in combination, do not cause more than minimal limitation in [her] ability to perform basic mental work activities and are therefore non-severe." (Tr. 15.) In so finding, the ALJ rejected the opinions of Drs. Smith, Foulk, and Warren, concluding that they were not consistent with

---

[12] In the future, the Magistrate Judge is encouraged to address all assignments of error when preparing a Report & Recommendation, in order to avoid the potential need for a re-referral.

32

the objective medical evidence of record.  (Tr. 15-16.)  At Step Four, the ALJ did not include any mental health-related limitations in the RFC, finding that Kelley could perform light work as defined in 20 CFR § 404.1567(b) with the additional limitations that she could frequently climb ladders, ropes, and scaffolds, and frequently stoop, kneel, crouch, and crawl.  (Tr. 17.)

For the following reasons, the Court finds that the ALJ properly evaluated the medical opinion evidence regarding Kelley's mental impairments and, further, that substantial evidence supports the ALJ's decision not to include mental health-related limitations in the RFC.

At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e).  On January 18, 2017, the SSA amended the rules for evaluating medical opinions for claims filed after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."[13] 20 C.F.R. § 404.1520c(a). Instead, the new regulations direct the ALJ to evaluate the persuasiveness of each medical opinion by considering the five following factors: (1) supportability; (2) consistency; (3) relationship with the plaintiff;[14] (4) specialization; and (5) any other factor "that tend[s] to support or contradict a medical opinion or prior administrative medical finding."  20 C.F.R. § 404.1520c(c).  Because the regulations consider supportability and consistency the "most important factors," ALJs are obligated to "explain

---

[13] The "treating source rule," which generally required the ALJ to defer to the opinions of treating physicians, was abrogated by 20 C.F.R. § 404.1520c for claims filed on or after March 27, 2017, such as here.

[14] This includes consideration of the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship. 20 C.F.R. 404.1520(c)(c)(3)(i) through (v).

how [they] considered the supportability and consistency factors for a medical source's medical opinions," while they "may, but are not required to, explain how [they] considered" the remaining factors. 20 C.F.R. § 404.1520c(b)(2).

Although these regulations are less demanding than the former rules governing the evaluation of medical source opinions, "they still require that the ALJ provide a coherent explanation of [his] reasoning." *Lester v. Saul*, 2020 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021).  The new regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'"  *Warren I. v. Comm'r of Soc. Sec.*, 2021 WL 860506 at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)).  An "ALJ's failure ... to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec*., 2021 WL 3056108 at *11 (W.D. Tenn. July 20, 2021).  *See also Childers v. Kijakazi*, 2022 WL 2706150 at * 5 (E.D. Ky. July 12, 2022) ("When the Court is unable to follow the ALJ's logic, error has occurred.")  That being said, an ALJ need not specifically use the terms "supportability" or "consistency" in his analysis.  *See Hardy v. Comm'r of Soc. Sec*., 2021 WL 4059310 at *2 (S.D. Ohio Sept. 7, 2021); *Terry Q. v. Comm'r of Soc. Sec*., 2022 WL 969560 at * 5 (S.D. Ohio March 31, 2022).

The ALJ evaluated the Dr. Smith's opinion regarding Kelley's mental health impairments as follows:

> Ronald Smith, Ph.D., examined the claimant at the request of the Division of Disability Determination (DDD) on February 26, 2019 (Exhibit 3F at 2). Dr. Smith concluded that the claimant would be capable of understanding and remembering job instructions, but her ability to carry them out successfully will be hampered by her

34

worry and anxiety. She may have trouble maintaining adequate attention and concentration and maintaining persistence in the performance of simple or more complex tasks, but would be able to respond appropriately to supervision and coworkers in a job setting. Finally, Dr. Smith concluded that the claimant may have some difficulty dealing appropriately with work pressures in a job situation due to her tendency to worry excessively and her feelings of anxiety.

The undersigned does not find the opinions of Dr. Smith fully persuasive [because] they are vague and imprecise and he did not provide quantified limitations. For example, he used the word "may" in his opinion to address ability to understand remember and apply information/ instructions; concentration persistent and pace and dealing with work pressures. In addition, this was a onetime interview, and it appears that Dr. Smith relied primarily on the claimant's subjective reports of symptoms and limitations. His objective findings do not support more than mild limitations in functioning. For example, Dr. Smith noted that the claimant was neat and clean in appearance and cooperative. Her responses were direct and to the point and thinking was well organized. Affect was appropriate with good range. The claimant reported that she is sad and afraid, but not depressed. Insight and judgment appeared good and cognitive functioning was intact.

(Tr. 15-16.)

The Court finds that the ALJ's evaluation of Dr. Smith's opinion is supported by substantial evidence. The ALJ concluded that Dr. Smith's opinions (i.e., that Kelley would have difficulty carrying out instructions and "may have trouble" maintaining adequate attention, concentration and persistence, and dealing appropriately with work pressures) were not consistent with his own objective findings. This conclusion is supported by substantial evidence. In his March 2019 opinion, Dr. Smith found that Kelley (1) displayed "well organized" thinking; (2) communicated and related well during her evaluation, (3) had an appropriate affect; (4) was neat, clean, and cooperative; (5) was able to perform cognitive functioning tests without undue difficulty; (6) had good insight and judgment; and (7) would be capable of handling funds if they were awarded. (Tr. 308-309, 311.) Dr. Smith also noted that Kelley indicated she had no trouble driving during the daytime and liked to read with her daughter and help her with her homework. (Tr. 306, 309.) Neither Dr. Smith nor Kelley

explained how any of these findings are consistent with Dr. Smith's assessment of limitations in the areas of carrying out instructions, maintaining concentration, persistence or pace, or dealing with work pressures.  Nor does Kelley cite to any other specific findings in Dr. Smith's evaluation that would support his assessment of limitations in these areas.

The ALJ also discounted Dr. Smith's opinions because they were based on a one-time interview and "it appears that Dr. Smith relied primarily on the claimant's subjective reports of symptoms and limitations." (Tr. 16.)  Kelley does not cite any authority that it was inappropriate for the ALJ to discount Dr. Smith's opinions on this basis.  To the contrary, courts have held that it is proper for an ALJ to discount a medical opinion that appears to be based on subjective complaints where (as here) the opinion is not supported by objective medical data.  *See, e.g., Cruz v. Comm'r of Soc. Sec.*, 2020 WL 9258402 at * 8 (N.D. Ohio Sept. 15, 2020) ("The Sixth Circuit has repeatedly upheld decisions to discount opinions that appear based on subjective complaints without sufficient support from objective medical data.') (citing *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004) and *Tate v. Comm'r of Soc. Sec.,* 467 Fed. Appx 431, 433 (6th Cir. 2012)).

Lastly, the ALJ discounted Dr. Smith's opinions on the grounds that they were "vague and imprecise" and failed to set forth any "quantified limitations."  (Tr. 16.)  Kelley contends that, to the extent the ALJ was unclear about the basis for Dr. Smith's opinion, the ALJ should have contacted Dr. Smith for clarification instead of according his opinion limited weight.  (Doc. No. 15 at p. 22.)  The Commissioner argues that the ALJ appropriately discounted Dr. Smith's as vague and, further, that the ALJ was not required to recontact Dr. Smith for further clarification.  (Doc. No. 19 at pp. 7-8.)

The Court agrees with the Commissioner. Under the regulations, the SSA will recontact a consultative examiner for clarification only when the examiner's report is "inadequate or incomplete." 20 C.F.R. § 404.1519p(b). *See also Dooley*, 656 Fed. Appx. at 122. Although Dr. Smith failed to quantify his opinion that Kelley "may have trouble" maintaining attention and concentration and dealing appropriately with work pressures, the Court is not persuaded that this failure renders his report inadequate or incomplete. In reviewing a consultative examiner's report, the SSA considers whether it provides "evidence which serves as an adequate basis for decisionmaking in terms of the impairment it assesses." 20 C.F.R. § 404.1519p(a)(1). The Court finds that the information contained in Dr. Smith's report regarding Kelley's mental status examination findings and self-reported activities of daily living provided the ALJ with an adequate basis to give limited weight to Dr. Smith's assessment of Kelley's mental functioning. In addition, the Court finds that Dr. Smith's failure to quantify his proposed limitations does not render his report incomplete. As the Sixth Circuit has explained, "[t]his is because a consultative examiner's report is not rendered incomplete by the absence of a statement about what a claimant can still do despite his limitations." *Dooley*, 656 Fed. Appx. at 122 (citing 20 C.F.R. §§ 404.1519n(c)(6); 416.919n(c)(6)). *See also Shoults v. Comm'r of Soc. Sec.,* 2020 WL 4782859 at * 4 (S.D. Ohio Aug. 18, 2020); *Foutty v. Comm'r of Soc. Sec.*, 2019 WL 3927236 at * 15 (S.D. Ohio Aug. 20, 2019). Accordingly, the Court finds this argument to be without merit.

Kelley next argues that the ALJ failed to properly evaluate the opinions of state agency psychologists Drs. Foulk and Warren. The ALJ found these opinions were "not fully persuasive," as follows:

> Lisa Foulk, Psy.D., evaluated the claimant's mental condition based on the evidence of record without examining the claimant on behalf of the DDD on March 5, 2019

(Exhibit 1A). Dr. Foulk concluded that the claimant had no limitations in her ability to understand, remember, or apply information, mild limitations in her ability to interact with others, moderate limitations in her ability to concentrate, persist, or maintain pace, and moderate limitations in her ability to adapt or manage herself. This assessment was affirmed upon reconsideration (Exhibit 5A).

The undersigned does not find the opinions of the evaluating sources full[y] persuasive as they are primarily based on the conclusions of Dr. Smith, which are also not fully persuasive, and they are not consistent with the weight of the objective evidence of record. For example, the claimant does not receive mental health treatment other than medication from her primary care physician (Exhibit 2F at 13). The claimant is not being treated for mental health symptoms by a mental health specialist. She has not had any hospitalizations or ER visits for mental health during the period at issue. The claimant was described as cheerful with an appropriate affect. She also reported that her symptoms are controlled with medication (Exhibit 2F at 26). The claimant was described as minimally anxious (Exhibits 5F and 8F at 12). The claimant's primary care physician indicated that stress exacerbates the claimant's gastrointestinal symptoms –not her mental health symptoms (Exhibit 8F at 4). Treatment records indicate that the claimant reported no difficulty with her memory (Exhibit 2F at 26). She was also generally and consistently described as cooperative (Exhibits 1F, 2F at 13 and 28, 8F at 12, and 11F at 15). She had good grooming and hygiene (Exhibits 2F at 13 and 28, 5F at 10, 8F at 12, and 11F at 15). She was also able to care for her activities of daily living, including caring for her young daughter (Exhibit 2F at 26). The undersigned also notes that the claimant's work history as a service manager and server demonstrates a greater capacity with no intervening change in mental health symptoms.

(Tr. 16.)

The Court finds that the ALJ's evaluation of the Drs. Foulk's and Warren's opinions is supported by substantial evidence. The ALJ specifically explained that these opinions were not consistent with "the weight of the objective evidence of record." (*Id.*) Kelley does not argue that the ALJ's conclusion is not supported by substantial evidence and, indeed, this Court finds that it is. Specifically, the record reflects that Kelley reported to Dr. Smith that (1) she had not had any psychiatric treatment, counseling, or hospitalizations since age 16; and (2) the only treatment that she was currently receiving for her depression and anxiety was medication prescribed by her primary care physician. (Tr. 308.) The ALJ also correctly noted that, while Kelley was occasionally described as

"minimally anxious," she is most frequently described in treatment notes as alert and oriented, "in good spirits," and "amiable," with good grooming and hygiene and "normal, cheerful, and appropriate" mood.  (Tr. 285, 300, 324, 376, 397, 423.)  Additionally, and as discussed above, substantial evidence supports the ALJ's finding that Kelley could perform her activities of daily living, including Kelley's statements that "she does get things done that she needs to do around the house most days," including doing laundry, cleaning the house, making her daughter's lunch and helping her with homework, running to the store, and driving.  (Tr. 45, 306, 310.)  Based on the above, the Court finds ample support in the record for the ALJ's decision to discount Drs. Foulk's and Warren's opinions.  Kelley's argument to the contrary is without merit and rejected.

Kelley next argues that, even though the ALJ found Kelley's depression and anxiety to be non-severe at Step Two, the ALJ was nonetheless required to consider the evidence regarding these conditions at Step Four and explain why she decided not to include any mental health-related limitations in the RFC.  (Doc. No. 15 at p. 20.)  Kelley asserts that the ALJ failed to do so and, therefore, remand is required.  (*Id.*)

The Court disagrees.  At Step Two, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (4)(ii) & 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c). The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.,* 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  However,

if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184 at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id*.

Here, the ALJ expressly noted in her summary of the applicable law that she was required to comply with SSR 96-8p's mandate to "consider all of the claimant's impairments, including impairments that are not severe." (Tr. 14.)  In addition, at Step Two, the ALJ again stated that she had "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity." (Tr. 15.)  Courts have held that an ALJ need not specifically discuss all non-severe impairments in the RFC assessment when the ALJ makes clear that her decision is controlled by SSR 96-8p.  *See, e.g., Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851-852 (6th Cir. 2020); *Turner v. Comm'r of Soc. Sec.*, 2021 WL 6275633 at * 4 (6th Cir. 2021); *Davis v. Comm'r of Soc. Sec.*, 2015 WL 5542986 at *4 (W.D. Mich. Sept. 18, 2015).  Moreover, the Court notes that, the ALJ herein did, in fact, expressly reference Kelley's depression and anxiety at Step Four.  (Tr. 19.)  Specifically, the ALJ noted that (1) in May 2019, Kelley denied depression and anxiety; (2) in January 2020, Dr. Solis noted that Kelley was cheerful and in no distress with a normal mood and affect; and (3) Dr. Solis' January 2020 mental examination findings were similar to previous examinations (citing Exhibits 2F, 5F, 9F, and 11F).  (Tr. 19, 20.) Kelley does not argue that the ALJ's findings are not supported by substantial evidence.

40

In light of the above, the Court rejects Kelley's argument that the ALJ failed to comply with SSR 96-8p.  Moreover, given this Court's finding that the ALJ's decision to discount the opinions of Drs. Smith, Foulk, and Warrren is supported by substantial evidence, the Court likewise rejects Kelley's argument that the ALJ erred in failing to include any mental health-related limitations in the RFC.

### 2.    Physical Impairments

Lastly, Kelley argues that the ALJ failed to address, at Step Four, other non-exertional limitations caused by her gastrointestinal impairments, including her need to take frequent restroom breaks and to be close to the restroom.  (Doc. No. 15 at pp. 22-24.)  Kelley also asserts that the ALJ failed to properly evaluate Dr. Solis' opinion on the same issue.  (*Id.*)  Specifically, Kelley maintains that the ALJ "must have found some of Dr. Solis' opinion" to be supported by substantial evidence but that she failed to adequately explain "what in the doctor's opinion was fully persuasive albeit not fully." (*Id.* at p. 23.)  Finally, Kelley argues that the ALJ's rejection of Dr. Solis' opinion is not supported by substantial evidence because Dr. Solis' limitations are consistent with her symptoms of anxiety, anorexia, nausea, weakness, fatigue, dehydration, and abdominal tenderness and pain.  (*Id.* at p. 24.)

The ALJ evaluated Dr. Solis' opinion, as follows:

The undersigned has considered the medical opinions of record in rendering this decision. Juan Solis, M.D., completed a medical source statement in January 2020 (Exhibit 8F at 6). Dr. Solis concluded that the claimant was capable of low stress jobs with 4 hours of sitting and less than two hours of standing/walking in an eight-hour workday. He also concluded that the claimant needs a job that allows for shifting positions at will, ready access to a bathroom, and unscheduled breaks 1-2 times a day. The claimant would also need to lay down and rest at unpredictable intervals 3 times a week for 20 minutes. Dr. Solis also concluded that the claimant can occasionally lift less than ten pounds, stoop 15 % of the time, crouch 10% of the time, and the claimant would be absent approximately three times a month.

41

> The undersigned does not find the opinions of Dr. Solis fully persuasive as they are not well supported and are not consistent with his own examination findings and other evidence in the record. For example, he notes that these limitations are the result of anxiety, anorexia, nausea, weakness, fatigue, dehydration, and abdominal tenderness and pain. On examination at that time, Dr. Solis noted some abdominal pain (Exhibit 8F at 12). However, her gait was normal in his exams and those of Dr. Berkowitz, there were no focal neurological deficits, the claimant was cheerful and in no distress, and mood and affect were normal. This was similar to previous examinations (Exhibits 2F, 5F, 9F and 11F).

(Tr. 19-20.)  Instead, the ALJ found the less-restrictive opinions of state agency physician's Drs. Gallagher and Hall to be persuasive because "they are well-supported and consistent with the objective evidence of record." (Tr. 20.)  Specifically, the ALJ explained that:

> [Drs. Gallagher and Hall] noted improvement in the claimant's condition, but with some continued occasional bloating.  They noted that treatment records document diffuse abdominal tenderness, but that the remainder of her physical examinations were within normal limits.  The claimant's endoscopy noted gastritis and inflammation, but biopsy was negative.

(*Id.*)

The Court finds the ALJ's evaluation of Dr. Solis' opinions is supported by substantial evidence.  The ALJ explained that Dr. Solis' opinions are "not well supported and are not consistent with his own examination findings and other evidence in the record." (Tr. 20.)  For example, the ALJ noted that Dr. Solis's extremely restrictive findings were based, in part, on Kelley's anxiety; however, treatment records consistently showed that Kelley was cheerful and in no distress, with normal mood and affect.  (*Id.*)  *See also* Tr. 368, 370.  This finding is supported by substantial evidence.  As discussed above, Kelley is frequently described in treatment notes as alert and oriented, "in good spirits," and "amiable," with good grooming and hygiene and "normal, cheerful, and appropriate" mood.  (Tr. 285, 300, 324, 376, 397, 423.)  Moreover, Dr. Solis' treatment notes from January 2,

42

2020 (the same date as his opinion) indicate that Kelley was "minimally anxious," not in distress, alert, oriented, amiable, not unkempt, cheerful, and appropriate.  (Tr. 376.)

As the ALJ correctly notes, Dr. Solis' opinions are also based on Kelley's reported anorexia, nausea, weakness, fatigue, dehydration, and abdominal tenderness.  (Tr. 367.)  However, elsewhere in the decision, the ALJ cites evidence that Kelley's abdominal condition improved with consistent treatment, as did her frequent need to use the restroom.  (Tr. 19-20.)  As discussed *supra*, this finding is also supported by substantial evidence in the record.  *See, e.g.,* Tr. 262 (treatment record noting that, on June 5, 2018, Kelley was "overall much better" with solid bowel movements and occasional bloating); Tr. 262 (treatment record indicating that Kelley reported "doing very well" until experiencing a flare-up in October 2018); Tr. 322 (treatment record indicating that, in March 2019, Kelley had no anorexia, nausea, weight loss, or apparent blood in her stool); Tr.359 (treatment record indicating that, in May 2019, Kelley "continues to be in symptomatic remission with Lialda," with one bowel movement daily without bleeding or abdominal pain); Tr. 421 (treatment record indicating that, in September 2019, Kelley's abdominal distress was controlled with no diarrhea, nausea, anorexia, or blood in her stool).

Based on the above, and reading the decision as a whole, the Court finds that the ALJ sufficiently explained her reasons for discounting Dr. Solis' opinions and, further, that those reasons are supported by substantial evidence.  The Court further finds that the ALJ adequately explained why she did not include any non-exertional limitations in the RFC relating to Kelley's reported need for frequent restroom breaks and, further, that her decision not to include such limitations in the RFC is supported by substantial evidence in the record.

Accordingly, and for all the reasons set forth above, Kelley's Second Assignment of Error is without merit and denied.

### VII.    Conclusion

For all the foregoing reasons, Defendant's Objections (Doc. No. 24) are WELL TAKEN, the Report & Recommendation (Doc. No. 23) is REJECTED, and the Commissioner's decision is AFFIRMED.

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  December 16, 2022            U. S. DISTRICT JUDGE

44